## HANAUER et al. *v.* BARTELS et al.

AGENT OF VENDOR — WHEN CARRIER IS.   M. sold, and agreed to deliver to B. & Co., at D., so soon as it should be manufactured, certain flour for a fixed price — nothing being said in the contract as to the carrier. M. shipped the flour per a carrier to B. & Co., and the carrier delivered it to S. & Co., instead of to B. & Co., as he was directed. B. & Co., offering to pay the 'charges on the flour, demanded it from S. & Co., who refused to deliver it. *Held* (1), that the carrier was M.'s agent; and, also (2), that both the carrier and S. & Co., who had received the flour, were M.'s agents.

WHEN TITLE VESTED — in such case (1) the title could not vest in B. & Co., the vendees, until there was a delivery and acceptance by them ; and (2) the vendees, B. & Co., accepted the delivery to S. & Co. as sufficient, by their unconditional demand of the flour and their offer to pay the charges due thereon, and the title at the time of acceptance vested in B. & Co., notwithstanding the agents (S. & Co.) of the vendor, M., refused to deliver the flour. And, also, in this action of

3. THE TENDER was sufficient.

INSTRUCTIONS — MISLEADING THE JURY — ERRONEOUS — *Vendor changing his vendee after shipment, and before delivery.* A sale by M. being claimed to have been made of the flour to Matzdorf (the carrier), the instructions given as to the sale were "calculated to mislead the jury, inasmuch as they seem to have limited the inquiry to a point of time anterior to the shipment," while the vendor had the right at any time before the acceptance of B. & Co. to have changed his mind as to the disposition of the flour; and if, between the shipment and the acceptance, M. made a valid sale to Matzdorf, the demand and acceptance while S. & Co. had the flour would be unavailing.

REPLEVIN — PROPER MEASURE OF DAMAGES *in detinet.* Interest on the value "from the time of the wrongful taking," is, where the property is merchandise kept for sale, or grain and other articles useful only for sale or consumption.

*Appeal from District Court, Arapahoe County.*

THIS is an action of replevin, in which the appellees filed their declaration, in one count only, claiming that the appellants unjustly detained two hundred and forty-six sacks of flour, valued at $2,460, the goods and chattels of the appellees, to the damage of the appellees $1,000. To which declaration appellants pleaded: First, *non detinet;* second, property in appellants; third, property in one Matzdorf.

Upon the trial below it was shown in evidence that McCormick had received from Bartels & Co. certain groceries, and was to pay for them in flour, which should be manufactured at Pueblo and shipped thence to Denver, where McCormick should deliver it to Bartels & Co. at the price of $7.50 per sack; and that two hundred and fifty-two sacks were manufactured, put up, and by McCormick caused to be shipped by certain carriers, one Matzdorf being in charge of the flour at its shipment; and that the flour was conveyed to Denver and there delivered by Matzdorf to the defendants (appellants), Matzdorf having been directed by McCormick to deliver it to Bartels & Co.; and that, upon their ascertaining that the flour was in Denver in the possession of the appellants, one of the firm of Bartels & Co., for the firm, went, before this action was begun — the exact date is not given — with Moritz Barth to the appellants and demanded the flour

as the flour of Bartels & Co., and offered to pay the charges upon the same, and the appellants refused to deliver it without an order therefor from Matzdorf (as Barth and Julius Bartels testified), or without the surrender of the warehouse receipt issued for the flour to Matzdorf (as Fred. Salomon testified); and that $326 had been paid as charges upon the flour by Salomon & Co.

McCormick testified as to a bill of sale given by him for the flour to Matzdorf. Had several conversations with Matzdorf while loading the train ; made arrangements with him, in case Bartels & Co. did not want the flour, he was to sell it, take the money to St. Louis and buy goods with it, along with any other money I could raise. He was to get from $30,000 to $40,000 worth of goods ; this was from the 10th to the 15th of April, while loading the train ; he got the bill of sale on this agreement, to carry out these plans between us ; think bill of sale was given afterward, about the 21st. I did tell Matzdorf to sell the flour if Bartels didn't want it, under the verbal agreement about purchasing goods ; I was to furnish all the money I could raise, and he to let me have all the goods I wanted out of the $30,000 or $40,000 he was to buy ; did not insert this in the bill of sale, because we were acting as the best of friends, in perfect good faith ; if Bartels let us have the flour it was to be made good with other flour ; if they would let him have the flour, why Matzdorf was to sell it to carry out our agreement about going to the States ; the bill of sale was made by me to Matzdorf six or seven days after the shipment ; the reason I gave it was to get the flour from Bartels & Co., under the agreement, and I promised to furnish flour to them in its place ; Matzdorf represented that he could get the flour without trouble by having a bill of sale and by my making good the flour to them afterward, which I agreed to do if he could make the arrangement ; I understood Matzdorf to say that he had seen Bartels & Co.; said he had been in Denver ; the bill of sale was made on these representations, and dated back at the time it was given.

The court below gave, among other instructions, the following :

"If prior to the 1st of April, 1868, Streeter, acting for McCormick, and by authority of McCormick, had contracted with the plaintiffs that McCormick should take of plaintiffs a quantity of groceries and should pay for the same in flour at a price agreed upon, to be delivered at Denver or at Pueblo, as plaintiffs should elect, and if, in pursuance of this agreement, plaintiffs did deliver to Streeter for McCormick, or ship to McCormick, a quantity of groceries to the value of $2,000 or more, and McCormick accepted the same in pursuance of the arrangement said to have been made by Streeter, and if, in March, 1868, the plaintiffs had instructed McCormick to ship the flour coming to them under the arrangement with Streeter to Denver, without designating the mode or method of transportation in particular, and if in April, 1868, McCormick, being the owner of the flour in question, acting in pursuance of the instructions before that time given by plaintiffs, delivered the flour in question to a Mexican carrier or carriers to be transported to Denver and there delivered to the plaintiffs, and without any authority in the carrier or carriers to make any other disposition thereof, then the delivery to such carrier or carriers was a delivery to plaintiffs, provided that the flour was of such quality as the plaintiffs had contracted for ; and if such carrier or carriers afterward, and in violation of their instructions or contract under which they received the flour from McCormick, deposited the flour with the defendants, to be stored and kept, or for any other purpose than the delivery thereof to the plaintiffs, the plaintiffs might, upon first making demand of the plaintiffs for the flour, maintain their action of replevin therefor ; so, if the delivery of the flour at Pueblo was to a carrier or carriers, McCormick contracting with such carrier or carriers that the carriers should deliver the flour for him to the plaintiffs in Denver, and if Matzdorf was employed by McCormick to see to the delivery of the flour by the carrier to the plaintiffs, but without authority to

make any other disposition thereof, unless by consent of the plaintiffs to be first by him obtained, such delivery to the carrier or carriers must be estimated to be a delivery to the plaintiffs (provided the flour was of such a quality as the plaintiffs had bargained for) and put such flour at plaintiffs' risk and invested plaintiffs with the title thereto from the time of such delivery, and if Matzdorf, in violation of his employment and authority from McCormick, caused the flour to be delivered to the defendants to hold and store for his use, the plaintiffs, upon first making demand upon the defendants for the flour, were entitled to their action of replevin therefor. If the plaintiffs made with Streeter, acting for McCormick, such contract for flour as above supposed, plaintiffs stipulating that the flour furnished by McCormick should be good flour, then McCormick was bound to deliver such flour as would be rated good flour in the Denver market, at which it was to be delivered, and plaintiffs were not bound to accept an article which would not pass as good flour in that market, and if the flour in question was not such quality, plaintiffs were not bound to accept the same, even though shipped by McCormick in pursuance of their order and consigned to them. Nor did the title and property in the flour pass to plaintiffs by such shipment; nor even though plaintiffs afterward, on finding the flour in possession of defendants, declared that the flour was theirs and demanded the same, or demanded that defendants should hold same to their use, does this alter the case or constitute such acceptance as to invest the property in plaintiffs unless plaintiffs then made examination of the flour or some portion of it, so as to know of its quality; for, though plaintiffs had actually taken the flour into possession, they might have afterward returned it if not of the quality for which they had bargained. If, before the shipment of the flour from Pueblo, McCormick had sold the flour to Matzdorf, or had placed the same in his custody to be disposed of by him for his own advantage, or for the advantage of McCormick, or of McCormick and himself, and not to be delivered to the

plaintiffs, and if the shipment thereof by the Mexican carriers was in pursuance of such arrangement, then, even though McCormick had before that promised the same flour to plaintiffs, the delivery to the carrier or to Matzdorf was not a delivery to plaintiffs, and plaintiffs at the bringing of this action had not, so far as appears by the evidence, any property in the flour, even though plaintiffs, on finding the flour in defendants' possession, claimed and accepted the same as their flour; in determining in what relation Matzdorf received the flour, if he did receive it, whether as the agent of McCormick with authority only to see to its delivery at Denver to plaintiffs, or as his own, or with authority to dispose of it for his own use or otherwise than to deliver it to plaintiffs, you should take into account the testimony of the witness McCormick in respect to this; what is said by this witness as to whether he or Matzdorf contracted with the carrier for the transportation of the flour and the rate to be charged therefor and what is said by him as to how and where he procured the sacks in which it was shipped; so, if the witness, Gustave Bartels, or any other witness, has said that Matzdorf procured these sacks, or any of them, you may take this into account; and if there is any testimony as to where Matzdorf procured the money to pay for the sacks, you may consider this; so if at the time of procuring these sacks, or at any other time, Matzdorf spoke of the flour in question as belonging to the plaintiffs, or asserted where any one else so spoke of it, you will consider this.

"So you will take into account the testimony of the witness Baxter, as to whether McCormick did or did not direct him to deliver flour to Matzdorf. So you will take into consideration the bill of sale alleged to have been executed by McCormick to Matzdorf, and in respect to which McCormick was interrogated, and in the letter of May 11, 1868, addressed by McCormick to Bartels, together with the testimony of McCormick in respect to the circumstances under which this bill of sale and letter were executed and written.

" You will bear in mind, however, that if the original delivery to Matzdorf, or to the carriers to whichsoever the delivery was, was solely for the purpose of transportation to Denver, there to be delivered to the plaintiffs, and if Matzdorf, after plaintiffs had demanded the flour of defendants, procured McCormick to execute the bill of sale of April 17, 1868, by falsely representing that thereupon the plaintiffs would be willing to surrender the flour to him, then Matzdorf took no title as against plaintiffs by the bill of sale, and in that case you will throw the bill of sale out of consideration.

" If, upon consideration of all these matters and circumstances above referred to, and all others in proof, which may appear to you to afford a fair inference upon this question, you are of opinion that the flour in question was, before its shipment at Pueblo, sold to Matzdorf, or was put in his custody or charge, or in the custody of the carriers spoken of in testimony, to be by Matzdorf appropriated to his own use, or to the use of McCormick, or both of them, or for any purpose other than its delivery to plaintiffs, you must find for the defendants, notwithstanding it shall appear from the evidence that McCormick had before that agreed to sell the same flour to plaintiffs, and that plaintiffs had paid for it and agreed to accept it, and that it was of such quality as plaintiffs had contracted for, and notwithstanding it shall appear by the evidence, that plaintiffs afterward, on finding the same in defendants' possession, accepted and claimed it as theirs."

The jury, in their verdict, found the property of 246 sacks of flour in the plaintiffs (appellees) ; and found the defend· ants (appellants) guilty, as complained of in the declaration, and found the value of the flour, $1,845, and assessed the plaintiffs' damages (interest on $1,845) at $831.27.

Messrs. CHARLES & PHELPS, for appellants.

Messrs SAYRE & WRIGHT, for appellees.

BELFORD, J. The contract obligated McCormick to deliver the flour in controversy to Bartels & Co., at the city of Denver. The carrier was not the designated agent of the vendees, and consequently a delivery to him cannot be regarded as a delivery to them. The flour, at the time the contract was made, was yet to be manufactured and the title could not vest in the vendees until it was ground and until there was a delivery and acceptance by them. The rule applicable to the sale of a specific and ascertained article cannot obtain here. Something was to be done on the part of the seller, and until it was performed, and until there was a delivery and acceptance on behalf of vendees, the title remained in him. The carrier to whom the flour was committed for transportation, as well as the appellants who received it from them, must be regarded as the agents of the vendor, and the law perpetuates this agency until some act is performed by the vendees which passes the title to them. After the flour reached Denver, and after Matzdorf had delivered it to the Salomons, and taken their receipt therefor, Bartels made a demand of them for the flour. The learned judge who tried the case, when resolving the motion for a new trial, was of the opinion that this demand was tantamount to an acceptance of the flour, and from the date of the demand, title vested in the vendees so as to enable them to maintain this action. It is clear that the flour in question was appropriated by McCormick to Bartels. His intention to deliver it to them is manifested by the directions given the carrier. Now it would seem, this being so, that if the appellees at any time assented, under such circumstances as to be bound by that assent, to what had been done by McCormick, if there was a meeting of their minds, the wrongful act of the carrier, or of any third person, would not take away from the acts of the buyer and seller the consequence and effect which the law would otherwise ascribe to them. *Sewell* v. *Eaton*, 6 Wis. 479 ; Benjamin on Sales, 246 to 271.

The evidence is clear that the appellees did assent, for upon finding that the flour was in possession of the defendants, Julius Bartels, acting on behalf of the plaintiffs,

repaired to the store of Salomon's, was shown the flour, claimed and demanded it as the flour of the plaintiffs. So far as he could do so, he assented to every thing which McCormick had done, and this too, knowing the failure of McCormick to comply with the contract, knowing that the delivery had not been made at the place agreed upon, knowing also that McCormick had not paid the freight; so that every fact upon which depended the final and absolute effect of his acceptance, was within his knowledge at this time, saving only the correspondence or failure of the flour to correspond with the quality contracted for. But the jury have found that in fact the flour was of the quality contracted for, and this being so, it is immaterial that Bartels did not at the time know it, for they had not an arbitary power to reject or to return it, if once accepted, but only in case it was inferior to that for which the plaintiff had bargained, and when the demand is unconditional, as in this case, the acceptance must be regarded as absolute. The stipulations of the contract of sale were inserted for the plaintiffs' benefit, and a compliance with them they were at liberty to waive. *Lewis* v. *Western Railroad Co.*, 11 Metc. 515.

They might have accepted the wheat elsewhere than at the place of delivery named, if they saw fit, and they were at liberty to accept it incumbered with a lien for the carriage, if it seemed to them to be for their interest, and if they did this with the assent of the vendor, they become invested with the property.

The only question, therefore, would seem to be whether or not the demand and avowed acceptance of Bartels while the flour was in Salomon's possession, could operate to vest the title in them, notwithstanding the bailee or agent of the vendor refused to deliver. The authorities on this subject are not uniform, and the English and American are in open conflict. In *Bental* v. *Burn*, 3 B. & C. 423, the action was brought to recover £13 14s, the price of a hogshead of Sicilian wine. On the trial it appeared that the bankrupts had sold to the defendants a hogshead of Sicilian wine, then lying in the London docks, and at the same time

a delivery order and invoice was made out and sent to the defendant, signed by the firm. There was no actual acceptance or delivery. Under these circumstances the court held that there could not have been any actual acceptance of the wine by the vendee until the Dock company accepted the order of delivery, and thereby assented to hold the wine as the agent of the vendee. In other words, that the Dock company refusing to deliver, there could be no actual acceptance of the goods by the vendee until he actually took possession of them. The principle here announced would seem applicable to the case at bar, and would be conclusive had not a different rule by a higher authority been prescribed. I refer to the case of *Tome* v. *Dubois*, 6 Wall. 548, where it is held that the conversion of personal property by a wrong-doer does not deprive the owner of the power of making a valid sale of it, and that a purchaser from the owner, upon giving the wrong-doer notice of the transfer, may demand the property, and in case of refusal, maintain an action for the wrongful retention of it. From this case it is apparent that when the vendor and vendee are of an agreeing mind, when the one intends to deliver, and the other to accept, that the object sought to be attained cannot be defeated by the wrongful act of a third person, who has no title except that arising from mere naked possession. It is further claimed, by the appellants, that before this suit could be instituted, it was the duty of the appellees to pay or tender to the Salomons the amount advanced by them to the carrier for freight. We think the Bartels did all they were required to do under the circumstances. They offered to pay the amount, which offer was not accepted. Besides, the Bartels could not pay until they knew the amount, and when the Salomons declined to give it, they absolved the Bartels from making an actual tender. The conduct of the appellants clearly shows that an actual tender would have been fruitless. Fred. Salomon informed Bartels when the demand was made that the flour would not be delivered up unless Bartels would return, or cause to be returned to him, the receipt that the Salomons had given Matzdorf for

the flour. The objection then to surrendering the flour was not that the money advanced to the carrier, as freight, had not been paid. It was that the receipt of the appellants was outstanding in the hands of Matzdorf. There is nothing in the evidence to show that at the time the demand was made the receipt had fallen into the hands of a *bona fide* holder for value, and the effect of such a receipt in the hands of such a holder it is not now necessary to determine. So far as it appears, it was at that time in the hands of Matzdorf, and may remain there to this day.

It is claimed, however, by appellants, that McCormick sold the flour to Martzdorf. Whether or not there was a sale to Matzdorf; whether or not Matzdorf had authority to divert the flour from its destination, were questions submitted to the jury, and they resolved them against Matzdorf. We think, however, that the instructions of the court on this subject were calculated to mislead the jury, inasmuch as they seem to have limited the inquiry to a point of time anterior to the shipment. According to the view we take of the case, it was competent for McCormick to have changed his mind as to the disposition of the flour any time after the shipment, and prior to the demand and acceptance by the Bartels. As we have said above, the delivery to the carrier was not a delivery to the vendees. The flour was at McCormick's risk, until acceptance by Bartels. If, during the time intervening between shipment and acceptance, McCormick made a valid sale to Matzdorf, then any demand or acceptance by the Bartels, while the flour was in the possession of the Salomons, would have been unavailing and nugatory. This view of the case was not clearly presented to the jury. The evidence on this whole subject of sale, and especially as to the time when the bill of sale was made out, is quite obscure   There is considerable room for doubt, upon the evidence in the record, whether the bill of sale ante-dated in point of actual execution, or post-dated the demand and acceptance of the Bartels. The instructions proceeded upon a false theory, as to the time when Bartel's rights vested, and as to the

effect of the delivery to the carrier, and being calculated to mislead the jury, the judgment must be reversed, and inasmuch as the case must be tried again, it is proper to allude to the measure of damages.

At the time this suit was brought, the statute allowed the defendant in replevin to retrieve the goods by executing a forthcoming bond. This course was pursued here. The rule of damages in actions of replevin is not uniform. It depends on the character of the property. In an action to recover a horse, or other property having a usable value, the value of the use during the detention has been regarded as the correct measure of damages. In many cases, interest on the value, from the time of the wrongful taking, would be a proper measure, and this seems to be the rule applied in all cases where the property detained is merchandise, kept for sale, grain and all other articles of property, useful only for sale or consumption. *Allen v. Fox*, 51 N. Y. 565 ; *Suydam v. Jenkins*, 3 Sand. S. C. R. 614 ; *Burgee v. Maybee*, 21 Wend. 144.

Judgment reversed, and case remanded for further proceedings.                         *Reversed.*