BECKWITH *v.* TALBOT.

2   639<br>15a. 250

STATUTE OF FRAUDS — *whether the mem. may be in several parts.* Several writings of different dates may be read in connection to show a mem. of an agreement, under the 12th section of the statute of frauds. R. S. 339.

Where a contract was signed by one party and retained by the other, letters subsequently written by the latter, in which the contract was clearly referred to, are sufficient to show his assent, and that he subscribed the contract within the meaning of the statute.

*Whether the relation of the several parts may be shown by parol.* If, by his own evidence, the party to be charged show the mutual relations between the several writings, he cannot object that parol evidence was necessary to connect them. The rule that parol evidence shall not be received to connect the several writings, if it exists, is not applicable where such evidence is received without objection, or where the party complaining introduces it.

PARTNERSHIP — *of its elements.* Certain cattle were delivered to plaintiff and two other persons, to be kept for a time, at the expiration of which they were to be sold by defendant. After deducting the first cost of the cattle, defendant was to retain one-half of the remainder of the proceeds, the other half to be equally divided between the plaintiff and the other persons. In this there was no partnership, for

1. There was no community of profit and loss;

2. Or of ownership in the subject of the contract.

PARTIES — *whether a particular contract is joint or several.* Upon performance of such contract by the three persons named therein, who were to have the care and herding of the cattle, each became entitled to his separate share of the proceeds of the cattle, and each may have his separate action for the failure of the defendant to perform his part of the contract in respect to selling the cattle and dividing the proceeds of the sale.

CONTRACT — *construction.* The cattle being upon defendant's range when the contract was made, and remaining there when the contract was completed; *Semble*, that delivery of the cattle to defendant was not necessary.

DAMAGES — *measure of.* For breach of such contract, in respect to selling the cattle and dividing the proceeds of sale, the measure of damages is the market value of the cattle when the contract was completed, deducting therefrom the first cost, and giving to plaintiff one-sixth part of the remainder, as provided in the contract.

*Whether interest may be allowed.* Although the case is not within the statute regulating interest, a reasonable rate of interest from the time the suit was begun may also be allowed as damages, and 10 per cent, as fixed by the statute in cases where there is no agreement, was properly allowed.

ERROR — *which does not prejudice.* Parol evidence being received of defendant's assent to a written contract, which he had not signed, the error, if any, was rendered immaterial by written evidence afterward produced fully establishing the same fact.

EVIDENCE — *tax schedule.* Upon a question of the number and value of cattle in a herd, a tax schedule made by defendant's agent, and at his request, showing those facts, is competent evidence against him.

## *Appeal from District Court, Pueblo County.*

THE issue is stated in the opinion. At the trial plaintiff (appellee) was first called as a witness and was proceeding to state a contract made October 7, 1870, substantially as in the writing of that date, which is set out in the opinion, when the defendant objected that this was within the 12th section of the statute of frauds, and the court sustained the objection, but allowed the plaintiff to prove service performed according to the agreement under the common count, which was found in the original declaration. Afterward, the plaintiff testified that he and his associates had fully performed the agreement by herding and caring for the cattle, as therein specified, and the court then ruled that evidence of the contract was admissible upon the question of damages. ' Counsel for defendant then produced the writing, dated October 7, 1870, and asked the following :

" Q. Is this [handing witness a writing] the agreement which was entered into between yourself and the Beckwith boys on the one part and the defendant upon the other, and about which you have been testifying, and upon which you ask to recover in this action ?

" A. It is.

" Q. Does that writing express the exact terms of the said contract?

" A. It does."

At defendant's request the writing so identified was then given in evidence to the jury by plaintiff, as stated in the opinion. Defendant then asked the following question:

" Q. Is the name, C. W. Talbot, signed to this instrument, your signature?

" A. It is, and that is the contract referred to, and the only contract."

The examination of plaintiff was then resumed by his own counsel, and they were permitted to ask:

" Q. Did Geo. C. Beckwith assent to and accept the terms of said contract?"

To which the witness answered: " A. He assented to said contract, and under said contract I acted."

Much evidence was given as to the number and value of the cattle mentioned in the agreement, and upon this point plaintiff produced a tax schedule which, at the head, bore the figures, 1872, and upon its face appeared to be a schedule of the real and personal property of defendant, and was sworn by Edwin F. Beckwith, one of defendant's sons. Elton Beckwith, another son of the defendant, testified that he made the schedule by authority of defendant, and that he was defendant's agent. Defendant objected that the schedule was not made by himself, nor did it appear that he had knowledge of its contents, and that it was irrelevant, which objection was overruled, and defendant excepted. Defendant afterward testified that he did not authorize the making of such schedule. Several letters written by defendant to plaintiff were put in evidence, of which two are given in the opinion. It was shown that the cattle ranged over a large country, in the Wet Mountain valley, some of which was claimed by defendant, but the greater part was public land; that the cattle were in this locality at the time the contract was made, and were kept there during the contract, and remained there at the expiration of the contract

in the possession of Edwin F. and Elton T. Beckwith, who were parties to the contract, and sons of defendant. Plaintiff testified that there was no understanding as to delivering the cattle at expiration of contract. Defendant testified that he understood that the cattle were to be delivered to him. Upon this point defendant prayed an instruction, which was refused, that if the cattle were to be redelivered, and this was not done, the plaintiff could not recover. The court charged upon the question of damages, as stated in the opinion. Upon motion for new trial the verdict was regarded by the court as excessive, and the plaintiff was required to remit $1,324.60, which he accordingly did, and judgment was entered for $4,113, and defendant appealed.

Messrs. CHARLES & PHELPS and Messrs. PATTERSON & THOMAS, for appellant.

Mr. HUGH BUTLER, for appellee.

BRAZEE, J. This is an action of assumpsit, commenced by summons, on the 12th of May, 1873, by the appellee against the appellant. A declaration was filed on the 16th of May, 1873, containing four counts, three of which were special counts for the breach of an express contract, and the fourth a common count for work and labor. The first and third counts were held bad on demurrer. On the 31st of May, 1873, the plaintiff filed an amended declaration, which contained only two counts, both special, for the breach of an express contract, to which the defendant plead the general issue. On the 12th of June, 1873, the plaintiff obtained leave to file, and filed, a second amended declaration, containing only two counts, both special, for the breach of the contract hereinbefore referred to, to which the defendant plead the general issue with notice of special matter, to the effect that the subject-matter of the plaintiff's special claim was a partnership transaction between the plaintiff, Elton T. Beckwith and Edwin F. Beckwith, and appellant, and the same was unsettled. The trial below

proceeded upon the theory that the common count was in the declaration, but, under the view we take of this case, it is wholly immaterial whether it stood with the special counts, or had been superseded by them.

The agreement declared on in the special counts was produced by the defendant at the trial, and by him was put in evidence, and is as follows :

   " WET MOUNTAIN VALLEY, *October* 7, 1870.

" This is to certify, that the undersigned have taken two thousand two hundred and five head of cattle, valued at $36,681.60, on shares, from George C. Beckwith, time to expire on the 5th day of December, 1872, then Geo. C. Beckwith to sell the cattle, and retain the amount the cattle are valued at above. Of the amount the cattle sell at, over and above the said valuation, Geo. C. Beckwith to retain one-half, and the other half to be equally divided between C. W. Talbot, Elton T. Beckwith and Edwin F. Beckwith.

(Signed.)       " C. W. TALBOT.
            " ELTON T. BECKWITH.
            " EDWIN F. BECKWITH."

Elton T. Beckwith and Edwin F. Beckwith were the sons of George C. Beckwith, one of whom, at the defendant's request, wrote the agreement, and after it was signed by the three other parties to it, the defendant took possession of the document, and retained it until the time it was produced and put in evidence on the trial by him. Four letters from the defendant to the plaintiff were put in evidence, all of them referring to the cattle, and two of them to the agreement, and are as follows :

     " DENVER, *September* 21, 1872.

" MR. TALBOT — *Sir :*   On my arrival from the mountains, I received your letter. As I have wrote you before, every day I see parties here that is offering their cattle very low, as the hard winter has discouraged them, and that is

the cause that cattle is so very low. There is now in the cattle in the valley, about $25,000, and I am frank to say that as the market looks, they cannot be sold for more than that sum. I have used every exertion for the last three months to sell. I engaged a man to sell them, and agreed to give him $1,000 to make sale of them, and he has written east, and advertised and tried to sell, without success. You suggest giving you a part of the cattle. That is entirely outside of the agreement. Also, where would be the interest put in the cattle coming from ; and also Elton and Edwin would be glad to do the same, but at that rate, I would not get my money back I put into the cattle. The cattle must be sold, and settled up, according to the agreement. I will do every thing I can, to sell at the best advantage, and you shall have every chance to get a purchaser for the cattle, so as to make the most out of them. I shall not give up the range ; as when the cattle is sold, I can buy three thousand head of stock cattle, from four year olds, cows, two year olds, and yearlings, for $12 a head, mostly large cattle, and I shall do so and put them on a range and see if I can't make up part of what I shall lose in the cattle we now have. You shall have no chance to complain in my keeping up to the agreement, as I shall strictly ; although I have heard you have made complaints to parties, which I think is very unfair, and the parties you told so, said so too. Therefore, I am determined to give you no reasonable cause of complaint, although I shall be willing to leave it to any person. If, on the other hand, I had not reason to complain when you worked yourself out of coming up with the cattle, while we were out in sleet and rain, and out all night in rain storms, and running our horses while they lay down in the road and died, you was to home taking your comfort. I think that looks little like cause for complaint. Also you employed the poorest men and boys to herd for you. I should not of mentioned this, or made any complaint, if I had not heard of your talk. As there will be a large loss in the cattle to me, I should make the best of it, and as I have reason to believe there will be

a big loss in the cattle falling short in count, by losing, strays, and stealing and other ways.

"Yours, respectfully,<br>"GEO. C. BECKWITH."

"DENVER, *November* 10, 1872.

"MR. TALBOT — *Sir:*    At first I thought it useless to answer your letter, as I am bound by the agreement, to sell the cattle in a very short time; that to commence pulling them out, and of the most desirable in the herd, and suppose I sold this thirty, then thirty and fifty more, until all the most desirable was sold, and at last, which would probably be months, and the balance would not bring enough to make the $31,000 I am offered.  Who would be the greatest loser then?  I would lose $30 to your $1, and by your movements when I was in the valley, that you was the only one that was interested in the cattle.  However, I have prolonged my letter.  As for setting a price on the cattle, if you had done your duty, you would have had the cattle counted, as you agreed to, and as you have seen fit not to perform your part of the contract, the cattle is to be sold as they are; and I see no other way, and as I am advised by the best lawyers here, not one man in a thousand would have given you the chance that I have done.  I notified you to get a purchaser for the cattle months ago, and what have I received from you in return for my pay?  I must say I have never been treated so meanly by a man in my life. My rights was to sell the cattle.  Does the agreement say that I was to say any thing to you or to any one else.  But what next.  You quarreled with me because I would not break the agreement, and give you the cattle to sell at figures less than I had kept them in Denver for sale.  Now I have been offered $31,000 for the cattle.  I have written to Edwin, and he will state to you what I wrote to him to say to you.

"Yours in haste,<br>"GEO. C. BECKWITH."

The contract was fully performed by the parties who signed it, by herding the cattle in the Wet Mountain valley, upon the defendant's range, where they were at the time the agreement was entered into, and where they remained after the time therein specified for the fulfillment of the contract had expired. It is here objected to the contract that it was not subscribed by the defendant, the party sought to be charged in this action, and is therefore inadmissible and incompatible as evidence, and of no binding force or validity whatever, under the statute of "Frauds and Perjuries" (Sec. 12, R. S. Col. Ter. 339), which provides that "Every agreement, that by the terms, is not to be performed within one year from the making thereof," unless some note or memorandum thereof be in writing, and subscribed by the party charged therewith, shall be *void*.

The defendant is not in a position to raise in this court the question of the admissibility of this contract in evidence, for the very good reason that he introduced it in evidence upon the trial. The question as to the validity of contract is one which the appellant is in a position to raise in this court, and is one of serious importance, if not the controlling question in the case. If the sole evidence of the contract rested in the document signed by Elton T. and Edwin F. Beckwith and the plaintiff, under some of the decisions, the contract would be taken out of the statute by the full performance of the contract by one of the parties to it; but, inasmuch as the authorities are conflicting, and nearly equally divided on this question, we do not place our decision upon that ground, but upon another.

It is a well-established rule of law that the note or memorandum evincing the agreement may be on one or many pieces of paper, cotemporaneous, or of different dates. The general rule is thus stated in Brown on Frauds, sec. 350: "The written memorandum need not be contained in a single paper, but may be made out by comparing and connecting two or any number of papers." Correspondence by letter between the parties is instanced as illustrating the rule, and he says: "A letter or other instrument, signed by the proper

party, may be for this purpose taken in connection with a previous writing not signed." Sec. 346.

Under this rule we are to look at the letters of the defendant to the plaintiff, to see whether they are a sufficient note or memorandum of the agreement in writing subscribed by the party charged to validate the agreement in suit. In the letter of July 20, 1872, this language is used: "You suggest giving you a part of the cattle; that is entirely outside of the agreement." Again: "The cattle must be sold and settled up according to the agreement." Further on: "You shall have no chance to complain in my keeping up to the agreement, as I shall strictly." In his letter of November 10, 1872, he says: "I am bound, by the agreement, to sell the cattle in a very short time;" and again: "Does the agreement say that I was to say any thing to you, or any one else?" As a witness in his own behalf, on direct examination concerning the contract, the defendant testified that the "matter was all talked over, and I thought understood. I said to my son Elton, 'You understand the matter; will you write the contract?' He wrote it, Talbot read and signed it, and then my sons signed it." On his cross-examination he further testified: "After being signed the contract was delivered to me, and has been in my possession ever since until this trial. It is the contract as we talked it over."

In view of this evidence of the defendant, can there be any doubt as to whether the defendant's letters referred to the agreement signed by the plaintiff and the defendant's two sons on the 7th of October, 1870, which, at the time he wrote the letters, was in the defendant's possession? It is said, in some of the cases, that the mutual relation of the writings must appear upon their face, and cannot be shown by parol evidence. This rule is, however, not uniform (See *Lee* v. *Mahoney*, 9 Iowa), but whether it is sustained by the weight of authority, or not, is immaterial in this case. That rule is applicable, if at all, to cases where the parol evidence to connect the writings is offered by the party seeking to enforce the contract, and objected to by the other side. It can have no application where such evidence is received without

objection, much less where the party sought to be charged, as in this case, voluntarily gives the parol evidence which serves to connect the writings, and which, when connected, evince the contract. Looking, then, at the agreement or memorandum of October 7, 1870, the defendant's letters and his evidence, there is no doubt that the letters referred to and affirmed that contract, as much as if the defendant had written thereunder, "I shall strictly keep this agreement on my part," and had then subscribed his name thereto. We hold, therefore, that the letters referred to the agreement of October 7, 1870, and were such a note or memorandum of the agreement subscribed by the party charged, as takes this contract out of the statute of "Frauds and Perjuries" (12th section), under the rule recognized and applied in *Jackson* v. *Lowe*, 1 Bing. 9; *Gale* v. *Nixon*, 6 Cow. 444–5; *Lee* v. *Mahoney*, 9 Iowa, 344.

It is claimed by the learned counsel for the appellant that under the contract the appellant, appellee and the two younger Beckwiths became partners, and therefore this action cannot be maintained. "A partnership is a contract of two or more competent persons, to place their money, effects, labor and skill, or some or all of them, in lawful business, and to divide the profit and bear the loss in certain proportions. The two leading principles of the contract are a common interest in the stock of the company, and a personal responsibility for the partnership engagements," says Kent, and a common title in the partners to the partnership effects is an element of this contract too well known to require more than a mere mention.

Under the agreement in question, there was no community of loss ; if the cattle, which were the subject-matter, had died the next day after the agreement was entered into, the whole loss would have fallen upon George C. Beckwith alone. Neither was there any community of title in the subject-matter ; there was no joint ownership in the original herd, nor in the increase thereof, created by the contract, but the title to the herd, and the increase thereof, remained in the defendant, who, alone, under the contract, had the right to

dispose of either. Such is the fair interpretation of the contract in these respects, and in this construction all the parties seem to have acquiesced. Neither was there any community of expenses, either between the four parties to the contract, nor as between the three who were to do the herding, for, as appears by the evidence, each of these three paid his own expenses, without contribution from the others. The contract, then, lacked these essential elements of a partnership, viz. : community of loss, community of title, community of expenses, and a common right to dispose of partnership property for the purposes of the partnership.

If this contract created a partnership it was an anomalous, abnormal monstrosity, unknown to the law, in which the legal title to the partnership assets, together with all the increase thereof, and the right to dispose of the same vested in one of the partners only, who was in no case to be liable for any of the expenses of the concern.

The next question presented for our consideration is, whether the plaintiff and the two younger Beckwiths were jointly interested in the damages which accrued by reason of the non-fulfillment of the contract by the defendant ?

We have seen, that, as between themselves, there was no joint expenses incurred by these three — each paying his own expenses, and the plaintiff hired herders at his own expense. So far, then, these three parties treated the contract as if their respective interests were several and not joint. If, as alleged in the declaration, the defendant had settled with his two sons, for their respective shares, it is clear that in that event the sons would have had no interest in the subject-matter of this action. Again, supposing the cattle had been sold at the agreed time, at an advance on the original valuation, and the sons had received, respectively, each his share of the proceeds of the sale, but the defendant had refused to pay the plaintiff any thing, could the plaintiff have maintained an action against the sons, jointly or severally, to recover any part of the proceeds which they might have thus respectively received from their father ? We think not. On the whole, upon the face of the con-

tract, and the light thrown upon it by the action of the parties under it, we regard it as an agreement of the defendant to compensate his two sons and the plaintiff, respectively, by dividing the proceeds of sale over and above the original valuation in the manner pointed out by the contract, and the non-fulfillment by the defendant gave the plaintiff a separate cause of action against him. It follows, then, that, in any view of the pleadings, the contract was properly in evidence, and afforded the only basis for damages in case of its non-fulfillment.

Another question is raised in regard to the measure of damages. The rule adopted in the court below was, that the increase of the herd in value, if any, afforded the measure of damages, and the court instructed the jury that if the contract was such as the plaintiff claimed, and the cattle were worth more than $36,681.60 at the expiration of the time fixed by the agreement for its fulfillment, and the plaintiff might and could have obtained more than that sum for them at that time, the plaintiff might recover the one-sixth part of the sum which might thus have been obtained after deducting $36,681.60, and this, we think, affords the proper rule for damages in this case, so far as it goes. Another item, or element, of damages was submitted to the jury, which was, that to the amount which they might find for the plaintiff, under the aforesaid rule, they might add interest upon such amount so found by them, at the rate of ten per cent from the 12th day of May, 1873, when the action was commenced, which, we think, was proper upon authority. In *Goddard* v. *Foster,* 17 Wall. 123, which was an action to recover for the value of services in assumpsit upon special promises, and common counts (Id. 128), the United States supreme court say:

" Beyond all question the plaintiff was entitled to interest from the commencement of the suit," and decided that as to the rate the *lex fori* is to govern. The fact that there may be no statute in the place where the transaction takes place does not prevent the recovery of interest. In such case interest, at a reasonable rate, conforming to the custom

of the locality, will be allowed by way of damages. *Young v. Godbe*, 15 Wall. 562.

If there was error in permitting Talbot, after objection, to testify that the appellant assented to, and accepted the terms of the contract of October 7th, 1870, no injury could have possibly resulted to the appellant therefrom; for the appellant, as subsequently appeared, assented to the contract by his letters, which have been referred to, and he testified to the same thing in his own behalf. The evidence so objected to simply went to establish a fact, the existence of which, viz.: the assent of the appellant to the contract of October 7th, 1870, there is no dispute between the parties whatever, and no injury could, therefore, have resulted to the defendant from overruling his objection in this respect. The tax schedule of the cattle herded under the contract in question was made by Elton Beckwith, who, as appears by his evidence, as well as by the defendant's letter of April 13, 1871, was authorized to make the same as the basis of assessment, and was competent evidence to go to the jury as the act of the defendant by his authorized agent, on the question of the value of the herd.

We find no error in the instructions; they were given in accordance with the views expressed herein. No ground for vacating is shown, and the judgment is accordingly

*Affirmed.*