**DAVIS CATTLE CO., INC.,**
**Plaintiff,**

**v.**

**The GREAT WESTERN SUGAR COMPANY and Great Western United Corporation, Defendants.**

**Civ. A. No. 74–W–1090.**

United States District Court,
D. Colorado.

April 9, 1975.

As Amended May 6, 1975.

Williams, Connolly & Califano by Paul R. Connolly, Jeremiah C. Collins, Thomas E. Patton and John W. Vardaman, Jr., Washington, D. C., Houtchens & Houtchens by Jerry C. Daniel, Greeley, Colo., for plaintiff.

Ireland, Stapleton, Pryor & Holmes by Hardin Holmes and Kenneth L. Starr, Denver, Colo., Shank, Irwin, Conant, Williamson & Grevelle by Ivan Irwin, Jr., Dallas, Tex., for defendants.

## MEMORANDUM OPINION

### *Findings of Fact and Conclusions of Law*

WINNER, District Judge.

Plaintiff's amended complaint pleads two counts. The theory of Count Two is that the sugarbeet growers' contracts which are the subject of this litigation are securities, and that the Court has jurisdiction of Count Two under 15 U. S.C. § 78aa. On January 16, 1975, applying as the law of this Circuit Mr. Steak, Inc. v. River City Steak, Inc., D. C., 324 F.Supp. 640, aff'd 10 Cir., 460 F.2d 666, I held that the growers' contracts are not securities, and Count Two was dismissed. This effectively dismissed Great Western United Corporation from the case because Count One claims only against The Great Western Sugar Company.

■ Plaintiff is a Kansas Corporation having its principal place of business in Kansas. Defendant Sugar Company is a wholly owned subsidiary of Great Western United, and neither is a citizen of Kansas nor does either maintain a principal place of business in Kansas. Moreover, diversity and jurisdictional amount are admitted as to the named plaintiff. Accordingly, jurisdiction of Count One under 28 U.S.C. § 1332 exists. This count asserts a claimed breach of the 1974 sugarbeet grower's contract between plaintiff and defendant Sugar Company, and, more particularly, a claimed breach of its provisions having to do with the initial payment to be made by the Sugar Company to the growers. The specific provisions of the contract giving rise to this controversy will be discussed in detail later in these findings.

■ Plaintiff sues for itself and on behalf of all other growers similarly situated, and the complaint asks that the case be certified and treated as a class action. On January 16, 1975, and by order formalized on Feburary 4, 1975, I found that the tests and requirements of Rule 23 for class action treatment were met, and it was ordered that the case be maintained as a class action under the provisions of Rule 23(b)(3). The class was defined as:

"All persons, including individuals, partnerships and corporations, who contracted to grow, grew and delivered prior to November 5, 1974 under a 1974 Sugarbeet Contract with Great Western Sugar Company 12 or more acres of sugarbeets."

The 12-acre limitation was fixed to meet the jurisdictional amount requirement spelled out in Zahn v. International Paper Co. (1973) 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511, and, based on the record made, each grower who, prior to November 5, 1974, grew and delivered to the Sugar Company more than 12 acres of sugarbeets under a 1974 sugarbeet contract has more than $10,000.00 in con-

troversy, exclusive of interest and costs. In accordance with the requirements of Rule 23(c) notice was sent to the class members in the approximate number of 4,000, and approximately 900 class members requested that they be excluded from the class. Records of these exclusion requests have been maintained by the Clerk of the Court and copies have been supplied to counsel for the parties.

Paragraphs 5 and 6 of the sugarbeet growers' contracts are the paragraphs important to this case, and they provide:

"5. Determination of Payment for Sugarbeets. All beets grown hereunder and delivered to the Company, in accordance with the terms of this contract, shall be paid for by the Company on the following basis:

"(a) The price per ton (2,000 lbs.) of beets delivered hereunder to the Company shall be determined upon the average net return per one hundred (100) pounds of sugar received by the Company from sugar manufactured by the Company at, or purchased for distribution from, its factories in the state of Colorado, Kansas, Montana, Nebraska and Wyoming which is sold by the Company during the period commencing October 1, 1974, and ending September 30, 1975 (both dates inclusive), and also upon the average percent sugar in all beets of the 1974 crop grown and delivered by the Grower to the Company under this contract, in accordance with the following schedule:"

[The contract then sets out a schedule for per ton payments dependent upon the sugar content of the beets and the "Average Net Return per 100 Pounds of Sugar."]

Then, after providing for certain adjustments, we reach the nub of the case which is paragraph 6 of the contract. That paragraph says:

"6. Payment for Sugarbeets. Subject to the deductions and assignments hereinafter authorized, *an initial payment shall be made by the Company*

*on or before the 20th day of November for beets delivered prior to the 5th day of November,* and an initial payment shall be made on or before the 15th day of each calendar month thereafter for beets delivered during the previous calendar month for which an initial payment has not theretofore been made *which shall be at the highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar and the sugar content of beets.* Further payments may be made by the Company at such times and in such amounts as the Company may deem to be justified by the aforesaid factors and the quantities of sugar sold. Final settlement in accordance with the terms of this contract, if any amounts be due after credit of all payments theretofore made by the Company to the Grower, shall be made on or before October 25, 1975, unless the Company receives assurance from the United States Department of Agriculture that it is going to report an 'actual raw sugar cost' in which event final settlement hereunder shall be made on or before ten days after the reporting of said 'actual raw sugar cost' or October 25, 1975, whichever is later."

It is agreed that the 1974 sugarbeet crop had an average sugar content of approximately 17.25% sugar, and the class members received as an initial payment for their 1974 crop a total of $28.-58 per ton, $2.33 of which included a payment made by the United States government, the net result of which is, of course, that the Sugar Company itself paid as its initial payment to the growers $26.25 per ton.

Although the contract's schedule does not list a 17.25% sugar content and does not contemplate an "Average Net Return per 100 Pounds of Sugar" of more than $15.00, extrapolation develops per ton payments for beets having a 17.25% sugar content for the following hypothetical "Average Net Returns per 100 Pounds of Sugar":

| Per 100 lbs. | Per ton payments |
|---|---|
| $15.00 | $ 27.407 |
| $20.00 | $ 36.518 |
| $30.00 | $ 54.840 |
| $40.00 | $ 72.962 |
| $50.00 | $ 91.184 |
| $60.00 | $109.332 |

The case has to do with whether the $26.25 per ton initial payment conformed to Great Western's obligations under the contract, taking into account past history of operations under earlier similar contracts. That being true, it is appropriate to supply a bit of company history and a summary of past grower-company relationships.

Great Western Sugar Company is one of Colorado's oldest and most respected companies, but in recent years it has been the target of successful and unsuccessful takeover attempts. After many years as one of the areas two largest sugar refiners, it found itself under new management and it became a part of a conglomerate owned by Great Western United. The conglomerate consisted of the unlikely combination of Great Western Cities [a land development company] Shakey's [a chain of franchised pizza pie parlors] and Great Western Sugar Co. Management changed from time to time, and with every change in management, there was an increase in grower concern as to company policies and stability. The sugar business being what it is, in the majority of the growing areas, Great Western was the only purchaser of the growers' beets, and just as Great Western is dependent upon the growers' acreage, the growers must rely on Great Western. The contract spells out that "The grower is an independent contractor," but many of the elements of joint venture are present in the overall picture of company-grower relationships. In fact, Charles R. Haning, a former of-

ficer of Great Western, testified that "we are semi-partners with the Growers."

For many years, Frank A. Kemp headed the company, and during his tenure relationships were harmonious and the growers trusted him implicitly. He typically had the company pay 80%–85% of the anticipated net returns for the sugar grown during a particular crop year, arriving at the amount of the payment per ton of beets through the use of the schedule contained in the contract. However, the passage of time led to deaths and retirements, takeover attempts, turmoil within the company, diversification of company efforts into unrelated fields, and a loss of grower confidence which had prevailed over the years.

Robert R. Owen became president of Great Western Sugar Company in 1968, and he served as such until 1971. He is presently the president of Great Western Producers Cooperative which just last year itself unsuccessfully attempted to acquire Great Western Sugar Company. During Owen's tenure as Great Western's president, he orally agreed to pay the growers 85% of the anticipated net returns. Grower-company realtionships were fairly good during Mr. Owen's term, but they did not always equal those which existed under Mr. Kemp.

George Wilber succeeded Mr. Owen in 1971, and grower relationships deteriorated. The growers did not trust Mr. Wilber and they did not trust company management. This distrust led to the execution of a written "side deal" for the 1972 and 1973 crop years under which Great Western contracted to pay as an initial payment 85% of the anticipated net returns. Through oversight, no such written "side deal" was discussed or signed for the 1974 crop year.

Undeniably, the record shows that with or without a written "side deal" the typical payment made to the growers was historically based upon 80%–85% of the reasonably anticipated per cwt. net return for sugar for the particular crop year in question. With equal certainty, 1974–1975 sugar prices have been, and, more importantly, in October, 1974, were reasonably anticipated as being more volatile than they had ever been before. This volatility resulted and was anticipated to result from many factors, among which were the end of the Sugar Control Act, an explosive world wide market stemming from natural disasters in several sugar producing areas, consumer price resistance, and the bugaboo of rampant inflation. The company must protect against an initial payment which, as of the following October 25, would prove to be more than 100% of the average net return per hundred pounds of sugar, and this is so because the company probably could not recover the overpayment from many of the growers. In earlier crop years, with sugar selling at an average net return of perhaps $10.00 per cwt., a cushion or hedge of $2.00 per cwt. was sufficient to protect the company, and a payment of 80%–85% of the reasonably anticipated net return represented the exercise of reasonable, good-faith business judgment on the part of the company under more normal circumstances. Presumably, this is the reason for the history or custom of the 80%–85% payment.

Defendant urges, and I agree, that 1974 economic conditions demanded more of a cushion than the hedge required under historical circumstances. The negotiating history of the contracts convinces me that the Sugar Company has long been determined not to obligate itself to pay an arbitrary amount which could break it, either this year or next. Illustrative of the evidence leading to this conviction on the company's part is a comparison of the Great Western contract with the growers' contract used by Holly Sugar Co. Holly agrees to pay as an initial payment 90% of the preceding year's average net return per cwt. of sugar. The Great Western growers wanted a similar provision in their contract, but, as explained by Mr. Owen, while Great Western's president, he re-

sisted any such contractual obligation because of his fear of a replay of the disastrous 1921 collapse in sugar prices. Instead, it was Great Western's policy to make a reasonable forecast of the anticipated average net return, allow a reasonable cushion, and pay the growers the difference as the initial payment.

The insistence of the growers on a 90% payment clause and the resistance of the Sugar Company to any such clause is just one element disproving any claim that the growers' contracts are adhesion contracts. On this point, the record establishes that Fuentes v. Shevin (1972) 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, is not applicable and that D. H. Overmyer Co. v. Frick Co. (1972) 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124, does apply. In other words, the growers' contracts are agreements negotiated between equals to provide for distribution of a fund to be derived from the joint efforts of the semi-partners—that is, the capital and labor of the growers in growing the beets and the capital and work of the Sugar Company in refining and selling the refined sugar. But, the negotiation of the contract is not the end of the story. Once the contract is agreed to, the equality comes to an end when we come to performance of the agreement, and all of the principles of Dittbrenner v. Myerson (1946) 114 Colo. 448, 167 P 2d 15, come into play under a challenge to the Company's performance. The Company argues that the amount of the growers' initial payment is a matter within the Company's almost unfettered discretion—an argument which emphasizes the superiority of the Company and the inequality of the parties in the contracts' performance. In Dittbrenner v. Myerson, Justice Stone quoted from Lord Hardwicke's opinion in the classic case of Earl of Chesterfield v. Janssen, and held that fraud is to be presumed where there is inequality between the parties. He then quoted from the early Colorado case of Sears v. Hicklin, 13 Colo. 143, 21 P. 1022:

" 'The principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between the parties is not confined to cases where a fiduciary relation is shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one over another, and applies to every case where influence is acquired and abused, or where confidence is reposed and betrayed.' "

■ Manifestly, Dittbrenner v. Myerson was a fraud case, and this case is not a fraud case. Nevertheless, the underlying equitable principles forming a part of the Colorado law of contracts apply. Applying those principles, then, Great Western does have some discretion in determining the amount of the initial payment, but it has an absolute duty to exercise complete good faith in the exercise of that discretion. Probably, Dittbrenner v. Myerson would permit a holding that Great Western has the burden of proving good faith once the inequality of the parties is established, but I do not go that far, and I leave the burden on plaintiff to prove lack of good faith on Great Western's part in its determination of the initial payment to be made under the terms and provisions of the 1974 growers' contract.

As will be seen presently, in the fall of 1974, Great Western was torn between what amounted to built-in conflicts of duty. The growers' contracts provide:

"(Great Western Producers) Cooperative has entered into or is contemplating entering into an agreement providing for the acquisition, lease, management or control of the Company from United which the parties presently expect will be closed during the 1974 season."

Great Western's directors owed fiduciary duties towards its stockholders in connection with this contemplated transaction, and those duties included the duty to be sure the stock brought a rea-

sonable price. This determination required a careful analysis of the anticipated price to be paid for sugar refined from the 1974 crop, and, after optimistic Great Western communications to shareholders which will be discussed later, the Cooperative's acquisition of the company was voted down by the security holders. Winnowed to its essentials, Great Western's problem was that from the standpoint of exercising a good faith judgment as to what the growers should be paid, it wanted the lowest possible price, but when acting for the stockholders, it wanted the highest price. This headlong clash of conflicting fiduciary and good faith duties put Great Western in an untenable position.

It is to be remembered that paragraph 6 of the growers' contract says that, subject to certain deductions, "an initial payment shall be made by the Company on or before the 20th day of November for beets delivered prior to the 5th day of November . . . *which shall be at the highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar and the sugar content of beets.*" In furtherance of its contractual obligation to determine the amount of the initial payment, and in accordance with established practice, certain Company officials were requested to study the matter and to make recommendations. Chief among these officials was Robert J. Fisher, Senior vice-president for Agriculture of Great Western, who for several years had made a similar recommendation. Mr. Fisher was deceased at time of trial, but he testified by deposition that he commenced the study to determine the amount of the 1974 initial payment in early September, 1974, and he then concluded that the anticipated average net return per cwt. of sugar was $25.00. Other Company officials made higher and lower estimates depending on whether the problem was being looked at from the grower payment viewpoint or company sale viewpoint. Despite Mr. Fisher's prediction of $25.00 per cwt. for sugar, he recom-

mended a payment of only $26.25 per ton, which, under the agreed schedule in the contract, is equivalent to only about $14.35 per cwt. Mr. Fisher's testimony is worrisome. The contract mandates that in making its good faith determination of the amount of the initial payment, the Company must take into consideration anticipated returns from the sale of sugar. Yet Mr. Fisher testified:

"Q. Did you take into consideration in arriving at your $26 figure any level of sugar net returns that the company expected to realize on an average for the entire marketing year?

"A. No, I did not.

"Q. *Did anyone in the company do so, so far as you know?*

"A. *Not that I know of with respect to the initial payment.*"

Additionally, under date of October 4, 1974, Mr. Fisher prepared a memorandum for Mr. Krentler in which he said:

"*While I realize the agriculture department's views may have to be modified to fit GWU cash and borrowing necessities,* I feel strongly that GWS will suffer acreage-wise next year if we do not pay at least the minimum amounts I now propose . . .

"At the moment I will stick with the conservative estimate I made on September 9 that our average basis (sic) price will be $25 per cwt. of sugar in the Chicago-West market for the year to end September 30, 1975. This equates to a net return in the West of about $23 per cwt. This in turn would mean average total payments to western growers of about $41.83 per ton of 1974 beets. If we paid initially at 85% of this amount, our November 20 initial payment would average $35.-55 per ton. I could not conscientiously recommend so high an initial payment at this time however in view of the serious risk to the Company if, for some presently unknown reason, the sugar market would completely collapse in 1975. Nor do I believe

that intelligent and fair-minded growers would want the Company to take so great a risk. On the other hand, I feel reasonably sure that the Co-op leaders will attack a $25 initial payment as being too low—even though such position would be inconsistent with their recent gloom and doom statements.

*"If anything, the estimate of GW prices I made a month ago is too low. All data currently available indicate a higher level* . . . .

"If we pay growers initially at the levels I now recommend, it would require us to attain average net returns for sugar of about $13.73 in the West. . . . (This is) less than 65% of the averages we have gotten for the marketing year just ended. . . . *"*

An analysis of Mr. Fisher's October 4, 1974, memorandum against the entire record in the case leads to the inescapable finding that the chief motivation for the initial payment determination was the borrowing capacity of Great Western rather than the contractually obligated test of a good faith determination of "the highest rate per ton that the company may deem to be justified taking into consideration anticipated returns from the sale of sugar." Illustrative of the evidence mandating this finding is the testimony of Gunther Fritze, a witness for defendant. He is an officer of one of the larger banks which finance Great Western, and he testified:

"Q. Did you ever discuss with representatives of the Sugar Company or United the level of the initial payment to growers for the 1974 crop, sugar beets which the company proposed to make or did make?

"A. I believe at various times we did discuss the proposed level of payments basically because that had an influence, direct influence of the amount of bank financing. The level of these payments, I believe, at times varied between—

were considered between twenty and thirty dollars a ton. *It depended on the amount of cash that the company had available.*

"Q. Did you express any views at any point to the company as to what a prudent level of amount would be?

"A. No. I did not enter into that consideration at all. I told the company that as long as they lived within this borrowing base formula, which was my primary concern to safeguard my loans, *they could pay out to the growers whatever they wanted to, but they had to live within this formula. I knew, obviously, you know, that this formula would permit them to pay within the range of twenty to thirty a ton*

. . . . . .

"Q. Did Mr. Haning . . . tell you what he anticipated paying to the growers as their initial payment . . . ?

"A. Yes. The exact time I am not aware of. Some time in September but for sure in October we talked about the various ranges that the company might be paying to the growers.

"Q. Was that range in the order of a hundred thirty-two million dollars?

"A. It was based at that time, I believe, more on how much per ton, and we were talking of ranges between twenty to thirty dollars a ton. *That is if the money was available.*

"Q. Is that what Mr. Haning said would determine whether it was twenty or thirty dollars, whether the money was available?

"A. Mr. Haning might not have said it, *but the whole gist of our conversations was that it depended on the availability of money."*

The growers did not contract for an initial payment the amount of which was to be determined by the availability of money to Great Western. They contracted for an initial payment based on a good faith determination of "the highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar." As Mr. Fisher candidly testified, anticipated returns from the sale of sugar were not taken into consideration, and Great Western did not live up to its agreement with the growers. That Mr. Fisher's testimony was no slip of the tongue is proven by his memorandum of November 16, 1974. That memorandum commences with this damning language:

> "Great Western's initial payments for 1974 sugarbeets, to be made November 20, were based on the following factors *and not on any particular level of sugar net returns that the Company expected to realize on the average for the entire marketing year* to end next September 30."

Easily understandable is Great Western's decision to base its initial payment on borrowing capacity. Its bankers said that this had to be the basis for the initial payment, and Mr. Fritze testified that a 78-million dollar loan exhausted the company's borrowing capacity. It is true that Great Western was able to generate enough cash internally to leave $23-million of its available loan unused, but it is crystal clear that the banks dominated the fixing of the amount of the initial payment. With this financial pressure on it, Great Western consciously elected to [or was forced by bank pressure] to breach the growers' contracts and to base the initial payment on the $20 to $30 per ton fixed by the banks as the loan value of the crop, albeit it is rudimentary that loan value differs markedly from market value and from "the highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar." Indeed,

Mr. Clayton, a company consultant, after testifying to $40 and $53 per cwt. price projections which will be discussed later, said, "The estimate we give to growers is a different figure than we use any place, okay? We are estimating that we will receive about $17.00 from our sugar, when we speak to growers, and the initial payment is based on that figure . . . we will pay about 85 percent, I think of that figure in November."

Of course, an additional pressure was the 11.5% interest Great Western had to pay on the 78-million which immediately brings into play another conflict between the duty Great Western, as a semi-partner, owed to the growers, and the duty Great Western owed to its stockholders who would have to pick up the tab for the interest. There is no uncertainty as to how that conflict was resolved. Mr. Haning testified:

"Q. Let me ask you this, is it correct to say the $132,000,000 is as much as the banks would lend you?

"A. I could not make that statement that direct because, to say that I could not get another two million dollars is facetious.

"Q. A hundred thirty, hundred forty million, is that as much as they would go?

"A. I could not get that much from the banks, no.

"Q. How much?

"A. Roughly $80,000,000 from the banks.

"Q. And where is the other 50?

"A. Internally generated cash. . . . The other question on this, other than just the fact of having money available, is the cost of money, okay? And we're entering into this payment at a very, very high interest rate, about 11½% to 12% prime, so that is also a major consideration. That interest payment is borne completely by the company, it is not shared with the

growers, *and even though we are semi-partners with the growers, quite frankly and candidly, as financial officer, if it comes down to splitting the line I'm going on the side of the stockholders and the company as opposed to the growers."*

Just how this inevitable conflict of interest can ever be resolved under a contract similar to the 1974 Great Western Growers' contracts I know not, and if future contracts leave to the company the ultimate right to fix the amount of the initial payment, Great Western will spend its corporate life walking a tightrope between threat of stockholders' suits for breach of fiduciary duty and growers' suits brought on similar grounds. In any event, under the existing contract, Great Western has its problems under Dittbrenner v. Myerson, *supra,* in attempting to justify going "on the side of the stockholders and the company as opposed to the growers."

It is easy to understand that Great Western didn't like the 11.5% interest it had to pay, but neither did the growers enjoy paying their bankers the same or higher rates on the loans the growers had to obtain to finance their crops. Great Western's contractual obligation isn't keyed to the interest it had to pay, and the Company must have known when it signed the contracts that if the price of sugar went up, the amount of money the Company would have to borrow *would go up correspondingly.* Indeed, it told its stockholders just that in its August 28, 1974, proxy statement quoted infra.

■ Without at this point passing on the question of whether Great Western was contractually obligated to an initial payment of 80%–85% of the "highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar," I find that the initial payment made by Great Western to the growers under the 1974 beet contracts did not fairly take into consideration anticipated returns from the sale of sugar; that the initial payment determination was based on many other factors, but that the contractual requirement that anticipated returns be a factor to be taken into account as one factor was ignored by Great Western, and I find that Great Western breached its 1974 contract with the growers in deciding upon the amount of initial payment the Company would and did make.

■ Additionally, for reasons which I shall explain presently, apart from the contractual requirement that anticipated returns from the sale of sugar be taken into account, I find that in fixing the amount of the initial payment, Great Western was guilty of fraud or such gross mistake as necessarily implies bad faith or a failure to exercise an honest judgment.

It is to be remembered that Mr. Fisher decided in September, 1974, that $25 per cwt. was a reasonable figure to use in computing the initial payment, but the payment actually made to the growers as announced on November 8, 1974, was based on a per cwt. level of $14.35. This, as has been seen, permitted the company to hold its borrowing to $78,000,000. Yet, on August 28, 1974, wearing another hat, Great Western United said in a proxy statement prospectus:

"Great Western Sugar has a recurring need to obtain short-term bank financing to pay growers during the time interval between the purchase of sugar beets and the sale of the finished products; it obtains the required funds through bank 'sugar-line' financing consisting of short-term loans. *Since growers receive approximately 85% of the amounts due to them in November or December of each year,* the sugar-line financing requirements are then at their highest. Great Western Sugar negotiated sugar-line financing amounting to $84,177,500 for the 1972 crop, and $81,166,000 for the 1973 crop. *Management presently anticipates that financing re-*

*quirements for the 1974 crop may substantially exceed any amounts previously borrowed by Great Western Sugar, although the financing requirements will be dependent in part upon future sugar prices."*

Undeniably, sugar prices went up, but the bankers froze the loan limits and effectively fixed the amount of the initial payment despite the higher prices and the higher anticipated returns. Great Western's financial needs went up, but its financial abilities went down, and the growers were made to bear the brunt of this revolting development.

Great Western's 1974 problems multiplied the built-in conflicts of interest under which the company operated. The Cooperative and Great Western United entered into a contract for the sale of the company. As a consequence of the increase in sugar prices, seven of United's twelve directors recommended against approval of the transaction by United's security holders. On September 30, 1974, United's security holders voted against the proposed sale of the company to the Cooperative.

Great Western's troubles were not over, for right on the heels of the defeat of the Co-op offer, the Hunt brothers made a tender offer. This meant that for purposes of talking to the growers, and because the banks had said that initial payments should be keyed to borrowing limits, management had to adopt a pessimistic attitude and talk the price down. However, for purposes of talking to the stockholders in support of management's effort to block the Hunt takeover, unbounded optimism was required. This is what the record shows:

*October 4, 1974.* Mr. Fisher's memorandum estimating $25.00 per cwt. as the price of sugar and a $35.55 per ton initial payment.

*November 4, 1974.* Mr. Fisher met with the growers and announced a

price of $14.35 per cwt. and $26.25 per ton as "the highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar."

*November 7, 1974.* Mr. Haning prepared his "Best estimate of Price," and he said that $40 per cwt. was the company's best estimate of the yearly average price. The consensus of the Board of Directors was that his estimate was too conservative.

*November 13, 1974.* Seven days before the growers' initial payment was made, Mr. Adelman, Chairman of the Board, wrote the stockholders recommending against the Hunt tender offer, and that letter said, inter alia:

"2. *Great Western Sugar Company estimates,* assuming that actual sales prices will approximate current prices for sugar contracts in the commodity futures markets for delivery through September, 1975, adjusted for regional price differentials, *that the average price for the Company's refined sugar for the next twelve months would approximate $53 per hundredweight.* Estimated earnings, based on this average, after taxes and preferred dividend requirements, would be approximately $113,000,000 or $54 per share ($44 on a fully-diluted basis) for the twelve months—well above the tender price.

"3. It is important to note that a change of $1 in the average price per hundredweight of sugar for a twelve-month period will change the Company's net earnings after taxes by approximately $1.30 per share ($1.10 on a fully-diluted basis). *At an average price for sugar of $40 per hundredweight, which the Company is presently using for internal projections,* estimated net earnings after taxes and preferred dividend requirements would be approximately $68,000,000 or

---

1. As part of the August 28, September 20, 1974, proxy solicitation, management estimated September, 1974, company profits as from $13-million to $15-million compared to

September, 1973, profits of $1,182,000. Per cwt. prices of $34.95 and $36.50 were mentioned in the statement.

$32 per share ($27 on a fully-diluted basis) for fiscal 1975 and $77,000,000 or $36 per share ($31 on a fully-diluted basis) for the twelve months ending September 30, 1975—well above the tender price."

*November 14, 1974.* Mr. Adelman notified stockholders that the company would use more than $3,000,000 of the company's funds to purchase 182,280 shares of its $1.88 preferred stock. The notice explained that on October 10, 1974, the company decided to pay all dividend arrearages on the $1.88 preferred and that it decided to satisfy all sinking fund arrearages on that stock.

*November 20, 1974.* An initial payment was made to the growers of $26.25 per ton which equates to a sugar price of $14.35 per cwt. *The same day* the Company's price for sugar was $61.85 per cwt.

*December 4, 1974.* Over Mr. Adelman's signature, Great Western ran an advertisement in the *Wall Street Journal* saying:

> "The price at which Great Western Sugar is selling its refined sugar has increased by $12.00 per hundredweight since November 13 to $61.85. As was pointed out in our letter of November 13, a change of $1.00 in the average price per hundredweight of sugar for a twelve-month period will change the Company's net earnings after taxes by approximately $1.30 per share (approximately $1.10 on a fully-diluted basis) for the same period. Sugar future prices, which had gone up since November 13, have recently been declining and are now slightly below the then-prevailing levels, and recent price reductions for refined sugar by certain east coast sugar refiners may expand into Great Western Sugar's market area, thereby causing a reduction from the current price level.

> "The Company has now fully complied with all sinking fund purchase requirements for the $1.88 preferred stock and has declared the next regular quarterly dividend due on the $1.88 preferred stock. In addition, the Executive Committee of the Board of Directors has authorized payment of all dividend arrearages on the $3.00 preferred stock, subject to compliance with certain legal requirements. Payment of these arrearages will free the Company from certain legal restrictions preventing payment of dividends on the common stock, although no decision as to any such payment has yet been made.

> . . . . . .

> "A majority of your Board of Directors recommended that you vote against the proposed sale to the growers' cooperative last September because they felt that the price was inadequate in light of the dramatic increase in sugar prices. Since that time prices of sugar have gone up far more than was anticipated and so has the Company's profit potential. Now the Hunt brothers, with their background of great wealth and experience in the commodities markets, are trying to buy control of your Company. Your Board again feels that the offering price is inadequate."

In a nutshell, then, we find that in a time span of ten days, depending on whose ox was being gored, Great Western forecast "anticipated returns from the sale of sugar" as $14.35 when it was forecasting for purposes of money paid out, and it predicted $40.00 or $53.00 for purposes of money to be paid in. On the day the growers were paid at the rate of $14.35 per cwt., Great Western was selling the sugar for more than $60.00.

This is some though not all of the evidence which mandates the finding that Great Western Sugar Company was

**1178**

guilty of fraud or such gross mistake as necessarily implies bad faith or a failure to exercise an honest judgment in determining the amount of the initial payments to the growers under their 1974 contracts with the company.

With these findings, the substantive law is not complex. Plaintiff is entitled to recover on each of two separate approaches to the problem.

1. The company is liable because it breached its contractual obligation to make an initial payment "on or before the 20th day of November for beets delivered prior to the 5th day of November . . . at the highest rate per ton that the Company may deem to be justified *taking into consideration anticipated returns from the sale of sugar* . . ." The Company promised to take into consideration anticipated returns from the sale of sugar and it did not do so.

2. In determining the amount the Company allegedly deemed itself to be justified in paying the growers, the Company was guilty of fraud or such gross mistake as necessarily implies bad faith or a failure to exercise an honest judgment in fixing the amount of the initial payment.

■ Generally, the courts have applied principles of arbitration law to contracts which give to one contracting party the right to determine the amount owed under a contract, but more accurately such contracts provide for an "appraisement" rather than an "arbitration." See, City of Omaha v. Omaha Water Company (1910) 218 U.S. 180, 30 S.Ct. 615, 54 L.Ed. 991. In a more conventional arbitration situation, Judge Doyle, speaking for the Supreme Court of Colorado, held that where the arbitrators were obliged to determine replacement cost on the basis of retail prices of the goods at the seller's place of business, and where, instead they found cost new less depreciation, there was a failure to follow the arbitration agreement and

the award was void. Skinner v. Davidson (1960) 142 Colo. 423, 351 P.2d 872. Judge Doyle said:

"It will be recalled that the language in question reads 'all items in Group D shall be paid for at replacement cost. Replacement cost shall be deemed to be that amount at which any item could be replaced at retail by an item of comparable kind, quality, and condition at seller's place of business.' It is said by plaintiff that this language was subject to construction by the judge, the trier of the facts, and that his interpretation is binding. But this is true only if the words are ambiguous. Western Colorado Power Co. v. Gibson Lumber & Coal Co., 65 Colo. 288, 176 P. 318; Bauer v. Goldman, 45 Colo. 163, 100 P. 435; Wagner v. Hallack, 3 Colo. 176. As we view these words, they do not appear to be ambiguous. On the contrary, the parties have carefully defined the terms which set up the method of valuation and thus the only question is whether the appraisal was carried out in accordance with the terms of submission as contained in paragraph 4 of the contract.

"As to the burden of proof, it is said in 3 Am.Jur., Arbitration and Award, § 165, that the party who bases his claim on the report or finding has the burden of proving the validity of the awards from the standpoint of patent defects and once this is accepted the burden shifts to the party who is attacking the finding. Cf. Lilley v. Tuttle, 52 Colo. 121, 128, 117 P. 896. As to a deviation from the terms of the commission to the appraiser, the authorities hold that if there is a variance the report is not binding on the contracting parties. See Swisher v. Dunn, 89 Kan. 412, 131 P. 571, 572. That case involved the purchase of a druggist's business. The contract contained the provision that the price of the stock of goods would be determined by appraisal 'at the invoice purchase price of all goods with the

cost of transportation added.' The action was by the seller to enforce the finding of the appraiser. The evidence showed that the appraisal of part of the goods had been on the basis of current wholesale market price, which in some instances, had increased since the date of the purchase of the goods. The Kansas Court declared:

'* * * The award of the appraisers, made in good faith, was binding upon the parties with respect to matters submitted to their judgment. But they were selected to appraise the value of the goods, not to interpret the written contract.

'An award of arbitrators which is the result of a mistaken view of the meaning of the language in which the terms of the submission are expressed is not binding.'

"To the same effect are the following cases: Ice Service Co., Inc. v. Henry Phipps Estates, 245 N.Y. 393, 157 N. E. 506; William H. Low Estate Co. v. Lederer Realty Corp., 35 R.I. 352, 86 A. 881; Stowe v. Mutual Home Builders Corp., 252 Mich. 492, 233 N.W. 391; Tabor v. Craft, 217 Ala. 276, 116 So. 132; Brennan v. Brennan, 164 Ohio St. 29, 128 N.E.2d 89.

. . . . . .

"Plaintiff's authorities do not suggest any principle of law different from the principles set forth in the above cases. Their cases involved attacks on the finding of an appraiser based on bad faith, bias or merely poor judgment. See, for example, Empson Packing Co. v. Clawson, 43 Colo. 188, 95 P. 546, holding that where parties have stipulated to the exercise by a third person of discretion, they are bound by his determination. There can be no quarrel with this rule, but it falls short of governing a controversy wherein the appraiser has disregarded his instructions."

■ It is the unusual case in which an arbitrator's award is set aside, but where there is a clear violation of the arbitration agreement, the award is void. A more typical case is Gaddis Mining Company v. Continental Materials Corporation (1961) D.C.Wyo., 196 F.Supp. 860, aff'd, 10 Cir., 306 F.2d 952. Defendant there wanted to write-in limitations on the arbitrators' authority, and the court refused to permit this. However, in reaching the opposite result, the court recognized the rule of Skinner v. Davidson, *supra*:

"Continental has the burden of proving its attacks on the validity of the arbitration award. Wright Lumber Co. et al v. Herron, 10 Cir., 199 F.2d 446. It has not sustained its attack. *It is true beyond cavil that the jurisdiction of arbitrators is limited to those matters or questions submitted to them.* Western Oil Fields, Inc. v. Rathbun [, 10 Cir., 250 F.2d 69]; Wright Lumber Co. v. Herron [, 10 Cir., 199 F.2d 446], and authorities cited therein."

The "question submitted" to Great Western was "the (payment of the) highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar." When the "anticipated returns from the sale of sugar" were not taken into account by the company, the "question submitted" wasn't answered, and Skinner v. Davidson, *supra*, applies. In applying it, one thing is to be noted. That case sent the matter back to the arbitrators, but the same result can hardly ensue here where it is Great Western which is to determine the amount of the initial payment. In fact, at the pretrial hearing of March 14, 1974, defense counsel agreed that if a breach of contract was found, the Court should determine the dollar amount of the initial payment. Of course, as will be seen presently, this problem does not exist under the second ground on which I have found liability on Great Western's part.

That second ground rests squarely on Empson Packing Co. v. Clawson (1908)

43 Colo. 188, 95 P. 546.[2] That case is closely parallel on its facts. In *Empson*, growers' contracts for peas were involved, and the contracts provided that the Empson Packing Company foreman "is to be the sole judge of the proper condition of the crops for canning." The foreman turned down most of plaintiff's crops, and Clawson's suit against the company was tried to a jury. The case was reversed because the trial judge let witnesses testify that in their opinion the foreman's decision to reject the peas was wrong. The Colorado Supreme Court held that instead:

" . . . the rule of law is, that where parties to a contract designate a party who is authorized to determine questions relating to its execution, and stipulate that his determination shall be final and conclusive, both parties are conclusively bound by his determination of those matters which he is authorized to determine, except in case of fraud, or such gross mistake upon his part as would necessarily imply bad faith, or a failure to exercise an honest judgment. (citing many cases, including, Martinsburg & Potomac R. R. Co. v. March, 114 U.S. 549, 5 S.Ct. 1035, 29 L.Ed. 255, Sweeney v. United States, 109 U.S. 618, 3 S.Ct. 344, 27 L.Ed. 1053, Chicago & Santa Fe R. R. Co. v. Price, 138 U.S. 185, 11 S.Ct. 290, 34 L.Ed. 917, and Kihlberg v. United States, 97 U.S. 398, 24 L.Ed. 1106.)"

Admittedly, the evidence in this case is conflicting, but, I resolve the conflict in favor of plaintiff, and I find that on the record made Great Western Sugar Company is liable to plaintiff and the members of the class under the rule of Empson Packing Co. v. Clawson.

In so holding, I am not unaware of defendant's whirligig arguments that the projections made to the stockholders were made by Great Western United [the parent] rather than by Great Western Sugar Company, and that they were made for a different purpose. Great Western United was projecting sugar prices based on information given to it by Great Western Sugar Company employees, and I concede that the purpose of the projections was different. However, each projection was required to be made in good faith; the projection for stockholder action required good faith and so did the grower estimate. The trouble is that the established purpose of each estimate was to paint the picture most favorable to management's positions to satisfy the conflicting interests presented. As I have said, the evidence establishes to my satisfaction, in the language of *Empson*, "fraud, or such gross mistake on (Great Western's) part (which implies) bad faith, or a failure to exercise an honest judgment."

It is not necessary to the resolution of this case to decide whether the growers and the company are joint adventurers. There is no clear rule to be derived from the cases as to the legal relationship resulting from contracts between growers and purchasing processors. See, 21 Am.Jur.2d, Crops, § 55, and an annotation, Validity, construction and effect of contract between grower of vegetable or fruit crops, and purchasing processor, packer or canner, 87 A.L.R.2d 732. Moreover, although I think that the tests of Realty Development Co. v. Feit (1963) 154 Colo. 44, 387 P.2d 898, defining a joint adventure are here met, liability is not here founded on the duty owed by one joint adventurer to another. See, Swann v. Ashton (1964) 10 Cir., 330 F.2d 995. The duty of one co-adventurer to another does not differ materially from the duty of a dominant party under the principles of Dittbrenner v. Myerson, *supra*, and, for that reason, I do not hold that the company and the growers are joint adventurers.

■ I come now to the question which has occupied so much of counsel's

**2.** Although the case is somewhat old, it is to be noted that the case has been frequently cited with approval in later cases including

Gaddis Mining Co. v. Continental (1961) D. C.Wyo., 196 F.Supp. 860, *supra*.

time and to which many pages of their briefs have been devoted. That question is whether there is an implied provision in the growers' contracts or a trade custom which requires the payment of an initial payment of 85% of the "anticipated returns from the sale of sugar." Clearly, for 1974, there was no such express provision in the contract, and, although the evidence shows a practice of usually paying an amount of between 80% and 85% of the "anticipated returns from the sale of sugar," I do not think that plaintiff has met its burden of showing a contractual obligation on defendant's part to pay any particular percentage of those returns.

■ The true concept of the contract is that the company shall in good faith pay the highest practicable amount, taking into account all relevant factors including the anticipated returns from the sale of sugar. That it did not take this essential element into account, I have already held, but it did and it was entitled to take other factors into account. To me, the argument about the 85% is mostly an argument over the distinction between tweedledum and tweedledee. I think that if the company was contractually required to pay 85% of the "anticipated returns from the sale of sugar," it could in good faith give greater weight to the volatility of the market, and it could reasonably apply the 85% multiplier to the smaller multiplicand than the multiplicand which it can in good faith use when a smaller percentage multiplier is utilized. In other words, if the 85% multiplier was required to be used, I would hold that the company could reasonably hedge its internal control figure by an additional $10, and that it could in good faith pay 85% of $30.00 per cwt. This would require a payment by the company of $25.-50 per cwt.[3] However, I do not think

that a similar reduction in the multiplicand is to be permitted if the 85% multiplier be rejected. Under these circumstances, I think that the company was bound to pay on the basis of its internal projections, and that if it is given a hedge to take care of the volatile market of fifteen percent in the percentage multiplier, that is all it can in good faith defend against. Accordingly, accepting the company's argument as to utilization of the 85% figure, I find that the company could in good faith pay the growers as their initial payment no less than 70% of the $40 figure used for the company's internal controls. That being true, I find that had the company taken into account the anticipated returns from the sale of sugar, $28.00 per cwt. is the lowest amount the company could have paid the grower's under the contracts' requirements. Extrapolating from the table in the contract, the initial payment per ton which Great Western should have made to the growers was $51.02 per ton compared to the $26.25 payment made by the company.[4]

This brings me to that which is for me the most difficult question in the case. Plaintiff says that it and the members of the class are entitled to interest on the $24.77 initial payment difference from November 20, 1974, to date of judgment, and plaintiff says that the interest should be at the rate of 11.5% per annum. The seeming confusion in the applicable law is well explained in State Trust & Savings Bank v. Hermosa Land & Cattle Co. (1925) 30 N.M. 566, 240 P. 469, where the court said:

"The question of interest is one much more often passed upon than carefully considered by courts. It is usually presented only incidentally to much more important issues, and often decided one way or the other at the close of exhaustive investigation of other

---

3. This figure and comparable figures in these findings are subject to contract adjustments in computing the amount of the judgment, but the figures are net after the $2.33 government payment. The parties have stipulated to the adjustments, and the amount owed, after the stipulated adjustments, is set forth at the end of this opinion.

4. See footnote 3.

questions, and with the perhaps unconscious feeling that it is not of sufficient magnitude to justify further serious labor. Again, the elements involved in determining the question are many of them so elastic in their application that cases may be rightly resolved in different ways without the distinction being apparent from the statement of them."

Here the question of interest is of sufficient magnitude to justify much serious labor. Although the amount of the judgment requires a calculation to determine the number of tons of beets delivered by the class members before November 5, 1974, it is likely that the interest alone would amount to $3-million to $4-million, and whether this amount is due from Great Western Sugar Company to the growers is not a question I intend to "pass upon" rather than to "carefully consider."

Moreover, counsel have at one time or another said that the interest problem is really the only question in the case. For example, just 10 days before trial, defendant asked to have the case certified for interlocutory appeal to review defendant's contention that the jurisdictional amount requirement should rest on the amount of interest claimed. In that motion, defendant argued that the principal amount owing would be voluntarily paid by defendant as a matter of course, and that the only matters in dispute were when that amount was due and whether interest was owed if payment was delayed. That motion said:

"Plaintiff's only good faith claim is for the interest allegedly due based on the Company's and the growers different interpretations about the timing of a certain part of the ultimate payments. That this is indeed the amount in controversy is pointed out clearly in a letter sent by plaintiff's counsel, Paul R. Connolly, to the class members.

" '. . . To the extent that the company may have shorted you on that [the initial] payment and in effect used your money, they are—if we are correct entitled to collect damages. The damages would amount to the interest that the Company should pay you for the use of your money.' "

As has been held, the company was required to pay the highest amount it deemed justified, taking into account the anticipated returns from the sale of sugar. This, then, closely resembles a requirement that the company be required to pay a reasonable amount, reasonableness to be determined by the contracts' provisions.

 The question of entitlement to interest is to be answered under Colorado law, even as to the growers who are citizens of other states and whose farms are in other states. See, Rocky Mountain Tool & Machine Co. v. Tecon Corp. (1966) 10 Cir., 371 F.2d 589; T & M Transp. Co. v. S. W. Shattuck Chem. Co. (1947) 10 Cir., 158 F.2d 909; Phillips Petroleum Co. v. Oldland (1951) 10 Cir., 187 F.2d 780.[5] Colorado follows a minority rule of conflict of laws in determining what law applies to interest questions, and Colorado holds that it is the law of the forum which governs. Anderson-Thompson, Inc. v. Logan Grain Company (1956) 10 Cir., 238 F.2d 598; Hays v. Arbuckle (1922) 72 Colo. 328, 211 P. 101; 25 C.J.S. Damages § 4 b, p. 632.

 A vast number of the interest cases in Colorado have been decided under 73 C.R.S. 5–12–102 and its predecessors. [I make no effort to review cases decided under 73 C.R.S. 13–21–101, which allows interest in personal injury actions from the date of filing the complaint.] 73 C.R.S. 5–12–102 provides:

"Creditors allowed six percent. Creditors shall be allowed to receive interest, when there is no agreement as to the rate thereof, at the rate of six

5. In limited circumstances, interest is governed by federal law. T & M Transport Co. v. S. W. Shattuck Chem. Co., *supra*.

percent per annum, for all moneys after they become due, on any bill, bond, promissory note, or other instrument of writing, or on any judgment recovered before any court or magistrate authorized to enter the same within this state, from the date of entering said judgment until satisfaction thereof be made; also on money due on mutual settlement of accounts from the date of such settlement, on money due on account from the date when the same became due, and on money received to the use of another and retained without the owners' consent, expressed or implied, from the receipt thereof; and on money taken or retained and fraudulently converted to the taker's use from the time of taking."

The cases relied upon by defendant in its brief and a host of others sing a litany that "interest is a creature of statute," and that "interest cannot be allowed on an unliquidated claim." During the last twenty-five years, in passing upon the allowance of statutory interest on unliquidated claims, the Colorado Supreme Court has had occasion to comment:

In Weaver v. First National Bank of Limon (1958) 138 Colo. 83, 330 P.2d 142 [a suit for breach of warranty]:

"Interest should have started running from the date of the entry of the judgment. C.R.S. '53, 73–1–2. The right to interest, independent of an agreement to pay it, is statutory. C.R.S. '53, 73–1–2, enumerates the cases in which it may be awarded. Denver, etc. Railroad Co. v. Conway, 8 Colo. 1, 5 P. 142, 54 Am.Rep. 537; Greeley, etc. Ry. Co. v. Fount, 7 Colo.App. 189, 42 P. 1023. 'An action in damage for a breach of warranty is not one of the enumerated cases.' Denver Horse Importing Co. v. Schafer, 58 Colo. 376, 147 P. 367. See Schlottman v. Pressey, 10 Cir., 195 F.2d 343, in which the Denver Horse Importing case is followed."

In Moreland v. Austin (1958) 138 Colo. 78, 330 P.2d 136 [a suit for fraud and deceit]:

"The judgment entered included interest on the amount of damages found ($4,953.33) at the statutory rate from the date of the commencement of the action, and counsel for plaintiffs in error contend that the allowance of interest was error under the authority of Keeney v. Angell, 92 Colo. 213, 19 P.2d 215. In Clark v. Giacomini, 85 Colo. 530, 277 P.2d 306, this court said that interest is not recoverable in an action for damages occasioned by fraud and deceit. Such, also, was the holding in Keeney v. Angell, supra. The trial court erred in allowing interest from the date of the filing of the complaint. Interest is a creature of statute, and our statute makes no provision for interest on unliquidated damages which may be awarded in actions of this kind."

In Hunter v. Wilson (1961) 147 Colo. 36, 362 P.2d 553 [a suit for the reasonable value of labor and services]:

"We find no authority for allowing interest in this case. Creditors shall be allowed to receive interest 'on money due on mutual settlement of accounts from the date of such settlement, on money due on account from the date when the same became due . . . .' C.R.S. '53, 73–1–2. This statute, allowing interest on book accounts, 'must be strictly construed.' Smith-McCord-Townsend Co. v. Camenga, 104 Colo. 7, 87 P.2d 751, 753. It has been held 'that interest can only be recovered in the cases enumerated in the statute.' West Elk Land & Livestock Co. v. Telck, 71 Colo. 79, 205 P. 270, 271.

"Keeping in mind that the trial court resolved the disputed matter on the basis of a fair and reasonable charge for work and services, it becomes necessary to determine whether interest thereon comes within the terms of the statute. Such a claim so cast by the

trial court is an unliquidated demand. Dexter v. Collins, 21 Colo. 455, 42 P. 664; El Paso County v. Flanigan, 21 Colo.App. 467, 122 P. 801.

"In El Paso County v. Flanigan, supra, the plaintiff sought to recover a judgment against the defendant 'for work and labor performed, services rendered, and tools and supplies furnished in building a wagon road . . . .' The court said:

" 'The court properly refused to allow interest on the claim. Interest in this state is a creature of statute and regulated thereby. It is only recoverable, in the absence of contract in the cases enumerated in the statute. [Citing cases.] The case at bar does not come within the statute as to allowance of interest. The claim was unliquidated.'

"Equally to the point and equally controlling is this language from the case of Dexter v. Collins, supra [21 Colo. 455, 42 P. 666]:

" 'The court instructed the jury that if they found for the plaintiffs, either under the express agreement or on the *quantum meruit,* in any amount, they should add interest thereto from the time the same became due, as to which the court told the jury there was no conflict, viz. December 31, 1889. This was error. We are unable to determine whether the jury found for the plaintiffs under the first or second cause of action. If under the second, the claim was for an unliquidated demand, and this court under our former statute concerning interest, has held, in the case of D.S.P. & P.R.R. Co. v. Moynahan, 8 Colo. 56, 5 P. 811, that interest was not recoverable in such a case.' "

In Hendrie v. Board of County Commissioners of Rio Blanco County (1963) 153 Colo. 432, 387 P.2d 266 [a suit for the cost of repairing a swimming pool]:

"Third, as to the matter of interest allowed. Hendrie contends that if he is liable that this is an unliquidated claim for a breach of contract and does not come within any of the situations enumerated in C.R.S. '53, 73–1–2. He points out that in Colorado interest is a creature of statute, citing among other authorities Denver, S.P. & P.R. Co. v. Conway, 8 Colo. 1, 16, 5 Pac. 142 (1884), and Weaver v. First National Bank of Limon, et al., 138 Colo. 83, 96, 330 P.2d 142 (1958). In this he is correct and no interest should have been allowed before judgment."

In Holland Furnace Company v. Robson (1965) 157 Colo. 347, 402 P.2d 628 [a fraud suit]:

"The trial court also awarded Mrs. Robson interest from the date of filing the complaint. This was error. This Court has consistently held that no interest may be recovered in an action for fraud and deceit. Moreland v. Austin, 138 Colo. 78, 330 P.2d 136; Keeney v. Angell, 92 Colo. 213, 19 P. 2d 215; Clark v. Giacomini, 85 Colo. 530, 277 P. 306. The portion of the award consisting of interest must be eliminated from the judgment."

In Credit Investment and Loan Co. v. Guaranty Bank and Trust Co. (1968) 166 Colo. 471, 444 P.2d 633 [negligent loan collection]:

"The court's award of interest on the judgment from March 25, 1957 is clearly improper. It was on this date that the bank took over collection of the notes and proceeded to effect some collections. The notes were owned by the bank. The claim for damages because of negligent collection was not existent in any form on that date and has never been settled. It is unliquidated and therefore, 1963 C.R.S. 73–1–2 which allows 6% interest on certain liquidated claims and for money due and owing, is not applicable. There is no other statutory provision allowing interest on unliquidated claims of this category prior to settlement either by mutual agreement or court judgment."

In Larson v. American National Bank, (1971) 174 Colo. 424, 484 P.2d 1230 [a suit for attorney's fees]:

"As a matter of cross-error, Hewitt argues that he was entitled to pre-judgment interest as this was a liquidated claim. We have held that where a claim is unliquidated interest is not permitted before judgment. Hendrie v. Board of County Commr's., 153 Colo. 432, 387 P.2d 266. Under the circumstances of this case, the amount due Hewitt did not become liquidated until such time as the court determined the reasonableness of the amount of his claim. Hunter v. Wilson, 147 Colo. 36, 362 P.2d 553."

Older Colorado cases applying this ritualistic approach are: Union Exploration Company v. Moffat Tunnel Improvement District, (1939) 104 Colo. 109, 89 P.2d 257 [a suit in the nature of inverse condemnation, but brought as a quiet title action]; Keeney v. Angell, (1933) 92 Colo. 213, 19 P.2d 215 fraud and deceit]; Clark v. Giacomini, (1929) 85 Colo. 530, 277 P. 306 [fraud and deceit]; West Elk Land and Livestock Co. v. Telck, (1922) 71 Colo. 79, 205 P. 270 [injury to property]; Denver Horse Importing Company v. Schafer, (1915) 58 Colo. 376, 147 P. 367 [breach of warranty]; Denver and Rio Grande Railroad Company v. Shaw, (1913) 56 Colo. 103, 136 P. 1052 [negligent injury to property]; Cobb v. Stratton's Estate, (1914) 56 Colo. 278, 138 P. 35 [failure to pay legacy]; Young v. Kimber, (1908) 44 Colo. 448, 98 P. 1132 [assumpsit for money wrongfully withheld in which the Court mentions that Colorado once had a statute which permitted the award of interest for money vexatiously withheld, but that the statute had been repealed]; Dexter v. Collins, (1895) 21 Colo. 455, 42 P. 669 [quantum meruit]; Denver, South Park and Pacific R. Co. v. Moynahan, (1884) 8 Colo. 56, 5 P. 511 [injury to property]; Denver, South Park and Pacific R. Co. v. Conway, (1884) 8 Colo. 1, 5 P. 142 [injury to property] and Greeley,

Salt Lake and Pacific Railway Company v. Yount, (1895) 7 Colo.App. 189, 42 P. 1023 [inverse condemnation].

The Tenth Circuit has similarly ruled that under the law of Colorado, statutory interest cannot be allowed on an unliquidated claim. In Rocky Mountain Tool & Machine Co. v. Tecon Corporation, (1966) 10 Cir., 371 F.2d 589 [judgment on a counterclaim for the value of services], Chief Judge Lewis said:

"It is settled that interest questions in a suit on a contract brought in federal court are to be determined by state law, whether jurisdiction is founded on a federal question or diversity of citizenship. Illinois Surety Co. v. John Davis Co., 244 U.S. 376, 37 S.Ct. 614, 61 L.Ed. 1206; Southern Painting Co. of Tenn. v. United States for the Use of Silver, 10 Cir., 222 F.2d 431; Wunderlich Contracting Co. v. United States ex rel. Reischel & Cottrell, 10 Cir., 240 F.2d 201, 206. The law of the State of Colorado where both contracts in this litigation were executed and were to be performed requires that, absent specific statutory authorization to the contrary, unliquidated damages bear interest from the date of entry of the judgment, not from the date of commencement of the suit. Hendrie v. Board of County Commissioners, 153 Colo. 432, 387 P.2d 266."

In Mitton v. Granite State Fire Ins. Co. v. Granite State Fire Ins. Co. (1952) 10 Cir., 196 F.2d 988 [negligence on the part of an insurance agent], it was said:

"Under Colorado law, 'interest is a creature of statute, and, in the absence of contract, is recoverable as such only in such cases as are enumerated in the statute'. Bankers Trust Co. v. International Trust Co. 108 Colo. 15, 113 P.2d 656."

Judge Pickett said in Schlottman v. Pressey, (1952) 10 Cir., 195 F.2d 343:

"This damage was the result of a breach of an express warranty respecting the weight of the casing sold, and judgment should have been en-

tered for the plaintiffs for such amount without interest as the damages were unliquidated. '35 C.S.A. Ch. 88, Sec. 2; Denver Horse Importing Co. v. Schafer, 58 Colo. 376, 147 P. 367."

Finally, in Dennis v. Bradbury, (1965) D.C.Colo., 238 F.Supp. 602, a quantum meruit action, Judge Doyle said:

"This is a diversity action which is governed substantively by the law of Colorado and this includes the right to interest. In Colorado, interest is wholly a creature of statute and thus is not allowable on a common law, or equity basis. See Hawley v. Barker, 5 Colo. 118 (1879); Denver S. P. & P. R. Co. v. Conway, 8 Colo. 1, 5 P. 142 (1884); Hunter v. Wilson, 147 Colo. 36, 362 P.2d 553 (1961). See also Mitton v. Granite State Fire Ins. Co., (10 Cir. 1952) 196 F.2d 988, 992.

"Neither usury nor actions in *quantum meruit* are enumerated in the Colorado interest statute . . .

. . . . . .

"There are numerous other Colorado cases which hold that interest is not recoverable in a *quantum meruit* action. See Dexter v. Collins, 21 Colo. 455, 42 P. 664, 666; Board of Commissioners, etc. v. Flanagan, 21 Colo. App. 467, 122 P. 801, 804; Hunter v. Wilson, 147 Colo. 36, 362 P.2d 553. Inasmuch as the cases do not recognize the right to interest in an action such as that at bar, the plaintiff's demand must be denied.

"Plaintiff's further contention that other sections of the interest statute apply, e. g., the section allowing interest for moneys after they become due on any bill, bond, promissory note, or other instrument of writing, must also be rejected. The instrument here is not within the contemplation of this section.

"It must be concluded, therefore, that the statute does not make provision for a claim such as that at bar. Accordingly, the claim for interest should be, and the same is hereby disallowed."

■ This array of authority leads to the inescapable conclusion that in Colorado, statutory interest cannot be awarded under '73 C.R.S. 5–12–102 on an unliquidated claim,[6] but this does not end the matter. Statutory interest is one thing, but there is another kind of interest—moratory interest or interest by way of damages. See, 22 Am.Jur.2d Damages, § 179, p. 256; Farnworth v. Jensen, (1950) 117 Utah 494, 217 P.2d 571; Speed v. Transamerica Corporation, (1955) D.C.Del., 135 F.Supp. 176, 199; Hartford National Bank and Trust Company v. E. F. Drew & Co., Inc., (1960) D.C.Del., 188 F.Supp. 347; and Parker v. Brinson Construction Co., (1955) Fla., 78 So.2d 873, where it was said:

"Interest in the more common acceptance of the term is the cost of hiring money or from the lenders point of view, the return for loaning it. It is compensation paid by a borrower to a lender for the use of the money and ordinarily we speak of interest as arising out of a contractual relation. It is generally considered to be a part of the principal debt itself. In its broadest sense, however, interest is often allowed by way of damages, such interest being moratory."

Although the award of interest as damages is a rapidly developing area of the law, [See, annotations, Interest as element of damages recoverable in action for breach of contract for the sale of a commodity, 4 A.L.R.2d 1388, and Interest on damages for period before judgment for injury to, or detention, loss or destruction of property, 36 A.L.R.2d 337], it is a concept which is by no means new to the law. The United States Supreme Court recognized the principle as long ago as 1872 in Young v. Godbe, (1872) 15 Wall. 562, 82 U.S.

6. Had I held that the growers were the co-adventurers with the Sugar Company, statutory interest should be awarded. Morris v. Redak, (1951) 124 Colo. 27, 234 P.2d 908.

562, 21 L.Ed. 250.[7] In this frequently cited case, it was held:

"If a debt ought to be paid at a particular time, and is not, owing to the default of the debtor, the creditor is entitled to interest from that time by way of compensation for the delay in payment. And if the account be stated, as the evidence went to show was the case here, interest begins to run at once.

"It is said there is no law in the Territory of Utah prescribing a rate of interest in transactions like the one in controversy in this suit, and that, therefore, no interest can be recovered. But this result does not follow. If there is no statute on the subject, interest will be allowed by way of damages for unreasonably withholding payment of an overdue account. The rate must be reasonable, and conform to the custom which obtains in the community in dealings of this character."

Miller v. Robertson, (1924) 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265 was a suit brought under the Trading With the Enemy Act. It was held:

"Compensation is a fundamental principle of damages, whether the action is in contract or in tort. Wicker v. Hoppock, 6 Wall. 94, 99 [73 U.S. 94], 18 L.Ed. 752. One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. Curtis v. Innerarity, 6 How. 146, 154 [47 U.S. 146], 12 L.Ed. 380. One who has had the use of money owing to another justly may be required to pay interest from the time the payment should have been made. *Both in law and in equity, interest is allowed on money due.* Spalding v. Mason, 161 U.S. 375, 396, 16 S.Ct. 592, 40 L.Ed.

738. Generally, interest is not allowed upon unliquidated damages. Mowry v. Whitney, 14 Wall. 620, 653 [81 U.S. 620], 20 L.Ed. 860. But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages." [emphasis added]

The Tenth Circuit's award of interest on an unliquidated claim under a fire insurance policy was affirmed in Concordia Insurance Company v. School District No. 98, (1931) 282 U.S. 545, 61 S. Ct. 275, 75 L.Ed. 528:

"In the absence of an authoritative state decision to the contrary, there was nothing in either which required the trial court in rendering its judgment to depart from the rule in respect of the allowance of interest which this court had recognized, namely, that, even in a case of unliquidated damages, 'when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages.' Miller v. Robertson, 266 U.S. 243, 257–259, 45 S.Ct. 73, 78, 69 L.Ed. 265, and cases cited. See also Standard Oil Co. v. United States, 267 U.S. 76, 79, 45 S.Ct. 211, 69 L.Ed. 519; Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 397, 65 A. 134."

Funkhouser v. Preston Co., Inc., (1933) 290 U.S. 163, 54 S.Ct. 134, 78 L. Ed. 243, mentions that the law on allowing interest on unliquidated claims is in evolution, and it holds that the demands of justice and practicality must govern. Board of County Commissioners v. United States, (1939) 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313, modified an opinion by the Tenth Circuit and held that, "The cases teach that interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness."

7. The case takes on historical interest when it is recognized that the action was against

Brigham Young as trustee for the Church of Jesus Christ to recover money advanced.

Royalty Indemnity Co. v. United States, (1940) 313 U.S. 289, 61 S.Ct. 995, 85 L. Ed. 1361 held:

"A suit upon a contractual obligation to pay money at a fixed or ascertainable time is a suit to recover damage for its breach, including both the principal amount and interest by way of damage for delay in payment of the principal after the due date. And in the absence of any controlling statutory regulation the trial court is as competent to determine the amount of interest for delay as any other item of damage. United States v. United States Fidelity Co., 236 U.S. 512, 528, 35 S.Ct. 298, 302, 59 L.Ed. 696; Young v. Godbe, 82 U.S. 562, 15 Wall. 562, 565, 21 L.Ed. 250; Maryland Casualty Co. v. United States, 5 Cir., 76 F.2d 626; United States v. Wagner, 9 Cir., 93 F.2d 77; United States v. Hamilton, 7 Cir., 96 F.2d 878; Massachusetts Bonding and Ins. Co. v. United States, 9 Cir., 97 F.2d 879, 881."

Since, as has been mentioned, under the circumstances here present, allowance of interest is a matter of state law, it is necessary to inquire as to whether Colorado recognizes moratory interest or the allowance of interest as damages. Moratory interest has been allowed in Colorado for more than 100 years. It was allowed in Browne v. Steck, (1873) 2 Colo. 70, and Beckwith v. Talbot, (1875) 2 Colo. 639, aff'd 95 U.S. 289, 24 L.Ed. 496.[8] Browne v. Steck was a suit for failure to pay money when due, and the parties had agreed to an interest rate of ten percent *per month*. There was no Colorado statute on usury, and the statutory rate was ten per cent *per annum*. The Court held that the agreed rate should be allowed as damages. It was said:

"A question of greater difficulty arises out of the stipulation in the note to pay interest, after maturity, at the rate of ten percent per month.

*The damages awarded for the detention of money after the day of payment are measured by the value of the money during the time which it has been withheld.* This is the reasonable rule of compensation, which restores the plaintiff to that which he has lost by reason of the breach of the contract, *and compels the defendant to surrender that which he has gained by the failure to keep his obligation.* Beckwith v. Hartford, P. & T. R. R., 29 Conn. 268. In law, the sum is awarded as damages for the breach of contract, which, it has been held, may not be regulated by the parties. . . .

"By our statute the rate of interest is not arbitrarily fixed at ten per cent, but it is declared that such shall be the rate when no other is established by the parties. The theory of the law is, that money may be worth more or less than ten per cent per annum, and that the parties may determine its value . . . . .

"From what has been said it will appear that the stipulation in the note to pay interest after maturity was prima facie sufficient to establish the measure of damages to be recovered for the breach of the contract. If it was, in fact, intended as a penalty to enforce payment of the principal sum, this might have been shown by proof that the going rate of interest at the date of the note was much less than that expressed in the instrument. No such proof was offered, and therefore the court was at liberty to accept the stipulation of the parties, as establishing the measure of damages."

In Beckwith v. Talbot, *supra*, the parties agreed to graze cattle on shares. It was held that the defaulting party owed interest on the unliquidated amount of profit he could have made on the sale of the cattle. Young v. Godbe, 15 Wall. 562, 82 U.S. 562, 21 L.Ed. 250, was cited

8. The first six volumes of the Colorado Reports are not reported in the Pacific Reporter.

with approval, and the Colorado Supreme Court said: [9]

> "In Goddard v. Foster, 17 Wall. 123, 84 U.S. 123, 21 L.Ed. 589, which was an action to recover for the value of services in assumpsit upon special promises, and common counts, the United States Supreme Court say: 'Beyond all question the plaintiff was entitled to interest from the commencement of the suit,' and decided that as to the rate the *lex fori* is to govern. *The fact that there may be no statute in the place where the transaction takes place does not prevent the recovery of interest. In such case, interest, at a reasonable rate, conforming to the custom of the locality, will be allowed by way of damages.*"

Omaha & Grant Smelting & Refining Co. v. Tabor, (1889) 13 Colo. 41, 21 P. 925, was an action in trover for the wrongful mining and sale of ore. The distinction between statutory interest and interest by way of damages was recognized, and it was held:

> "It is true, as stated by the learned judge, 'that interest in this state is a creature of statute and regulated thereby; that it is only recoverable in the absence of contract in cases enumerated in the statute; and that damages to property arising from a wrong or negligence of the defendants is not one of the enumerated cases.' This could not come under the last clause of the instruction. It is not for damage to property. It is for the wrongful detention of money belonging to plaintiffs.

> · · · · · ·

> "The general rule in trover is that the damages should embrace the value of the property at the time of the conversion, with interest up to the time of judgment, and this rule has been followed in almost if not all the states, and seems right on principle. But our statute does not seem to have received

the same construction here as in the state of Illinois. While in that state it has been put plainly and squarely as interest under the statute, in our state damage for the detention of the money equal to the legal interest upon the value of the chattels converted from the time of the conversion has been allowed, not as interest, but as damage. Machette v. Wanless, 2 Colo. 169; Hanauer v. Bartels [2 Colo.] 514; Tucker v. Parks, 7 Colo. 62, 1 P. 427."

Relying on two early cases tried in the Colorado federal court (New Dunderberg Min. Co. v. Old, 8 Cir., 97 F. 150, and Cooper v. Hill, 8 Cir., 94 F. 582) it was held in Brown v. First National Bank, (1911) 49 Colo. 393, 113 P. 483, that where the claim for misappropriated funds was unliquidated, interest could be allowed as damages, and that the interest could be awarded in either an action at law or a suit in equity.

Craig v. Dewey, (1918) 65 Colo. 362, 176 P. 836, stands as the Colorado court's first real discussion of moratory interest. There, a Missouri guardian sued to require a Colorado conservator to turn over funds of the ward. The funds had been invested in non-interest bearing certificates of a bank of which the Colorado conservator was cashier, and it was to the bank's benefit to retain the funds. Interest was awarded as damages. The Court held:

> "The defendants contend that in no event are they liable for interest. The certificates in question were drawn to the order of John Rohan, executor, and were endorsed 'No interest after maturity.' It is admitted that demand was made by Craig as domiciliary conservator for the estate funds in the hands of the bank and Dewey, and that such demand was refused. Interest is now claimed as damages by reason of the wrongful refusal by the defendants to pay over the money due the estate.

9. Presumably, if I had held that this was a true joint adventure, this case would be au-

thority for allowing statutory interest against the Sugar Company.

"The question of damages for wrongful refusal to pay money due has never been directly passed upon in this state. In Browne, et al. v. Steck, 2 Colo. 70, however, the principle of allowing interest as damages is there recognized and approved. At page 77 the court in that opinion said:

"'There is unquestionably a technical difficulty in enforcing a contract for the payment of interest after the same contract has been broken by the non-payment of the principal sum, but this difficulty may be overcome by regarding the interest agreed upon, as damages which the law will award, as compensation to the injured party.'

"The reason for and propriety of this rule is discussed in Hubbard v. Callahan, 42 Conn. 524, at page 530, 19 Am.Rep. 564, as follows:

"'This rule allowing interest as damages originated in the desire of the courts to adhere to certain technical rules, and at the same time do justice to the parties. Interest could only be allowed on the ground of an express or implied contract to pay it. In case therefore of an express written contract covering the subject-matter, but which was silent as to interest, the express contract could not be enlarged by adding a promise to pay interest, and there was no ground or right to imply such a promise. But as it was extremely unjust to allow the defendant to have the use of the money loaned without compensation, interest was allowed, in the nature of damages, for the detention of the money.'

"In 22 Cyc. 1495, the doctrine as approved in some twenty-five state jurisdictions, and in the Supreme Court of the United States, as well as in England and Canada, is stated as follows:

"'Although in some cases of breach of contract to pay money interest has been allowed on the ground of an implied contract to pay interest that arises from a failure to pay the principal, the general rule established by the great weight of authority is that where there is a contract, express or implied, to pay money, even though such contract be silent as to interest, interest will be allowed upon its breach as damages, and not because of any promise to pay it.'

"In this case Dewey, as cashier of the bank, was wrongfully withholding the payment of money due an estate of which he was ancillary conservator. Plainly it was to the advantage and profit of the defendant bank, and to Dewey, as a stockholder therein, to retain possession of the funds as long as possible. It was equally advantageous to the estate to have control of the money for reinvestment or for the care of the incompetent. *Solely by reason of the wrongful conduct of Dewey and his co-defendant, the bank enjoyed a substantial income which should have gone to the estate of the incompetent. In equity and good conscience both the bank and Dewey should be required to make proper restitution as damages for their wrongful and unlawful conduct.*"

In Hays v. Arbuckle, (1922) 72 Colo. 328, 211 P. 101, an action for money lent, interest was allowed as damages, and the court quoted with approval from Browne v. Steck, *supra*, and Craig v. Dewey, *supra*. The court reiterated the language in *Browne*, "This is the reasonable rule of compensation, which restores the plaintiff to that which he has lost by reason of the breach of the contract, and compels the defendant to surrender that which he has gained by the failure to keep his obligation." Similarly, interest was allowed as damages in Mansfield v. Harris, (1926) 79 Colo. 164, 244 P. 474, an action for money had and received.

Bankers Trust Company v. International Trust Company, (1941) 108 Colo. 15, 113 P.2d 656, is the leading Colorado

case discussing moratory interest. That opinion by Judge Knous establishes these principles of Colorado law:

1. Even where statutory interest may not be allowed, interest by way of damages can be awarded.

2. The measure of damages is the guilty party's gain rather than the victim's loss.

3. In the absence of proof as to the amount of the guilty party's gain, the statutory rate should be awarded, but if there is proof of the amount of benefit to the guilty party, that amount should be awarded as damages.

Judge Knous said:

*"Where, as here the person who alleges he was defrauded, waives the tort and elects to sue in assumpsit, the amount of the guilty party's gain, i. e., benefit, not the amount of the victim's loss, is the measure of what is recoverable.* 24 Am.Jur. p. 52, § 224. See, also, Keener on Quasi-Contracts page 200. A person upon whom is thus imposed the duty to pay the value of a benefit, consisting of a definite sum of money, which he has received, 'is also under a duty to pay interest upon such value from the time he committed a breach of duty in failing to make restitution.' Restatement of the Law—Restitution, p. 618, § 156. 'Where restitution is due because of the rescission of a transaction for fraud, * * * there is a breach of the duty of restitution at the time of the transaction.' Restatement of the Law—Restitution, page 619, section 156, Comment a. Consistently, courts generally have held that interest should be computed from the date of the taking on the theory that plaintiff's election relates back thereto. Felder v. Reeth, 9 Cir., 34 F.2d 744; Wolfe v. Shell Pet. Corp., 10 Cir., 83 F.2d 438; Newton Mfg. Co. v. White, 53 Ga. 395; contra, Dougherty v. Chapman, 29 Mo.App. 233. See, also, Note, Ann.Cas.1913D, page 239, and 33 C.J. page 203, § 60.

"Notwithstanding that in this jurisdiction the decisions are uniform in holding that interest is a creature of statute, and, in the absence of contract, is recoverable as such only in such cases as are enumerated in the statute (Denver, etc., R. R. Co. v. Conway, 8 Colo. 1, 5 P. 142; Denver Co. v. Schafer, 58 Colo. 376, 147 P. 367; Young v. Kimber, 44 Colo. 448, 98 P. 1132, 28 L.R.A. [N.S.] 626, and other cases cited in Clark v. Giacomini, supra, 85 Colo. page 536, 277 P. 306), *the courts of this state even when interest is not recoverable under the statute, by distinguishing between interest as such, and interest as damages, many times have allowed the equivalent of interest in the way of damages for the tortuous taking and detention of money or property.* Brown v. First Nat. Bank, 49 Colo. 393, 113 P. 483; Mansfield v. Harris, 79 Colo. 164, 244 P. 474; Omaha, etc., Co. v. Tabor, 13 Colo. 41, 21 P. 925; Mayo v. Wahlgreen, 9 Colo.App. 506, 50 P. 40; United States Home Co. v. O'Connor, 48 Colo. 354, 110 P. 74, and Beckwith v. Talbot, 2 Colo. 639. In the case of New Dunderberg Min. Co. v. Old [8 Cir.], 97 F. 150, 153, which involved a conversion of ore, and which arose in the District of Colorado, Judge Sanborn of the Eighth Circuit, after an extensive review of the authorities, including particularly those of Colorado, said: '*A statute giving express authority therefor is not indispensable to the recovery of interest for the wrongful detention of money or of the value of converted property, and where no such statute exists a reasonable rate of interest conforming to the custom of the locality will be given by way of damages.* Young v. Godbe, 15 Wall. 562 [82 U.S. 562], 21 L.Ed. 250; Beckwith v. Talbot, 2 Colo. 639, 650. When interest is recoverable as damages, the result is the same, whether it is given under the one or the other name, and hence it is error without prejudice that it is allowed as interest

when it should have been allowed as damages.' See also, Cooper v. Hill, 8 Cir., 94 F. 582. It is to be noted in passing that in the New Dunderberg case, it was held that since it was immaterial whether the interest was awarded as such or as damages, it was equally immaterial whether it was demanded in the prayer of the complaint as the one or the other. See, also, Sutherland on Damages, 4th Ed., page 940, vol. 1, and 33 C.J. page 257, section 188.

"For the reasons stated we are of the opinion that the period for which interest was to be computed and allowed was properly fixed by the questioned instruction. It does not appear why the rate for computation was fixed at seven and one-half per cent per annum by the instruction, but, conjecturally, it might be inferred that the court was of the opinion that such was the *loss of the plaintiff* by reason of the fact that the notes purchased provided for that rate. *If this was its theory, the instruction in that respect was erroneous, since, as we have mentioned, the basis of the recovery was the benefit to defendant. In the absence of proof as to the rate which would produce an amount equal to such benefit, the statutory legal rate should be adopted.* Beckwith v. Talbot, supra; New Dunderberg Min. Co. v. Old, supra."

The Tenth Circuit has frequently allowed interest as damages. In Robberson Steel Co. v. Harrell, (1949) 10 Cir., 177 F.2d 12, the Court recognized that Oklahoma law does not permit the award of statutory interest on an unliquidated claim, but it was held that "compensation is a fundamental principle of damages, whether the action be in contract or tort; and one who fails to perform his contract is justly bound to make good all damages which naturally and reasonably accrue from the breach. And while generally interest is not allowed upon unliquidated damages prior to the entry of judgment, the court may, in the exercise

of a sound discretion include interest or its equivalent as an element of damages when it is necessary to arrive at fair compensation. Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265, Concordia Insurance Co. v. School District No. 98, 282 U.S. 545, 51 S.Ct. 275, 75 L. Ed. 528."

Colorado law was in question in Phillips Petroleum Co. v. Oldland, (1951) 10 Cir., 187 F.2d 780, a suit to recover an overriding royalty. The Court mentioned that it had on occasion "said rather dogmatically" that interest may not be awarded on unliquidated claims, but it held that to serve the demands of fairness, interest should be awarded. Judge Murrah said:

"The question remains whether the allowance of interest was justified under the facts. This being a diversity case, the question is controlled by Colorado law, T. & M. Transp. Co. v. S. W. Shattuck Chemical Co., 10 Cir., 158 F.2d 909, and we have the word of the trial judge when he spoke for the Colorado Supreme Court, to the effect that Colorado courts may allow the 'equivalent of interest in the way of damages for the tortuous taking and detention of money or property.' Bankers Trust Co. v. International Trust Co., 108 Colo. 15, 113 P.2d 656, 665. And, following Colorado law, we have sustained the power of a court of equity in the exercise of its sound discretion to allow interest upon equitable considerations, even though it could not be recovered by law. Gaskins v. Bonfils, 10 Cir., 79 F.2d 352. We have said rather dogmatically that 'interest may not be allowed on an unliquidated claim.' Grand River Dam Authority v. Jarvis, 10 Cir., 124 F.2d 914, 918. See also Saulsbury Oil Co. v. Phillips Petroleum Co., 10 Cir., 142 F.2d 27, 40. But, courts now generally allow interest on unliquidated claims 'according to their concept of the demands of justice and practicality.' Funkhouser v. J. B. Preston Co., 290 U.S. 163, 54 S.Ct. 134, 136, 78 L.

Ed. 243. It is given or withheld in the discretion of the chancellor 'in response to considerations of fairness.' Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 352, 60 S.Ct. 285, 289, 84 L.Ed. 313. And see Brown v. Home Development Co., 129 N.J.Eq. 172, 18 A.2d 742; Meyers v. Texas Co., 6 Cal.2d 610, 59 P.2d 132; John Agnew Co. v. Board of Education of City of Paterson, 83 N.J.Eq. 49, 89 A. 1046; McCormick on Damages, pp. 206–233."

Voss v. Wiseman, (1956) 10 Cir., 234 F.2d 237, was a suit by the Director of Internal Revenue to recover interest against a transferee for the period of time he held the transferred assets. The Court held that under the statute, the transferee was obligated to pay any statutory interest owed by the transferor, but that there was no statute requiring the payment of interest for the time the transferee held the property. The court held that the transferee was liable for interest as damages. Kansas law does not allow statutory interest on unliquidated claims, but Judge Phillips allowed plaintiff interest as damages in St. Paul Mercury Indemnity Co. v. United States, (1952) 10 Cir., 201 F.2d 57. In doing so, he quoted with approval from several of the cases I have referred to. The same rule was applied in Buchanan v. Leonard, (1954) D.C.Colo., 127 F.Supp. 120, a suit for property damage resulting from defendant's negligence. The opinion in that case says:

"Now as to interest: under the Colorado statute interest as such ordinarily is not recoverable on unliquidated damages. 73–1–1, 73–1–2, C.S.A. 1953; Schlottman v. Pressey, 10 Cir., 195 F.2d 343; Mitton v. Granite State Fire Ins. Co., 10 Cir., 1952, 196 F.2d

988; Pearl Assur. Co. v. School Dist. No. 1 in San Miguel County, Colo., 10 Cir., 1954, 212 F.2d 778. However, it is also well settled that even as to unliquidated demands, in the absence of an authoritative state decision to the contrary, the Court in its sound discretion can award interest, or its equivalent, as an element of damages. Concordia Ins. Co. of Milwaukee v. School District No. 98 of Payne County, Okl., 282 U.S. 545, 51 S.Ct. 275, 75 L.Ed. 528; St. Paul Mercury Indemnity Co. v. United States, 10 Cir., 1952, 201 F.2d 57. Thus, in Robberson Steel Co. v. Harrell, 10 Cir., 177 F.2d 12, this circuit pointed out that compensation is a fundamental principle of damages whether the action be in contract or tort, and while conceding that interest on unliquidated demands as such was not allowable under the laws of Oklahoma, wherein the action arose, determined that the Court may, in the exercise of sound discretion, include interest, or its equivalent, as an element of damages when it is necessary to arrive at fair compensation."

As I understand Colorado law,[10] under the findings of fact which I have made, plaintiff and the members of the class are entitled to interest on the money not paid to them but which I have found became due them on November 20, 1974. They are not entitled to that interest as statutory interest under the provisions of '73 C.R.S. 5–12–102, but they are entitled to it as damages— they are entitled to moratory interest. Remaining for determination, then, is the problem of the rate of interest to be applied. Defendant argues that the interest must be awarded at the six percent statutory rate,[11] and there are com-

---

10. Other Colorado cases supporting my conclusions as to moratory interest are Hanauer v. Bartels (1875) 2 Colo. 514; Montgomery v. Tufford (1968) 165 Colo. 18, 437 P.2d 36; Martinelli v. Merchants Oil, Inc., (1970) Colo.App., 470 P.2d 55, and Deeb v. Caniff (1971) 29 Colo.App. 510, 488 P.2d 93. Spiecker and Ruland [now Judge Ru-

land of the Colorado Court of Appeals] generally agree with my conclusions in "A Creditor's Right to Interest in Colorado," 35 Colo.Law Review 190.

11. If interest be due under the statute, the statutory rate governs, and it is mandatory to allow the statutory interest without proof of damage. See, Stone v. Currigan (1959)

**1194**

ments in some Colorado and Tenth Circuit cases supporting this contention. However, I think that the cases supporting defendant's argument are cases which pass upon but do not consider the problem, and I think that such comments are inconsistent with the underlying theme of giving just compensation by awarding interest as damages. The cases which fully consider the matter reach this conclusion. For example, in United States v. United Drill & Tool Corp., (1950) 87 U.S.App.D.C. 236, 183 F.2d 998, the court held that although the statutory rate could serve as a guideline, the ultimate duty of the trial judge was to fix a rate which would adequately compensate the plaintiff. To me the question is not an open one in Colorado. Bankers Trust Company v. International Trust Company, (1941) 108 Colo. 15, 113 P.2d 656, by the language I have heretofore quoted from that case, settles the Colorado law on the subject. The statutory rate applies where there is no proof of benefit to the defendant:

". . . . *the basis of the recovery was the benefit to defendant.* In the absence of proof as to the rate which would produce an amount equal to such benefit, the statutory legal rate should be adopted."

Other cases, several of which I have heretofore quoted, mandate this conclusion. See, Young v. Godbe, *supra*; Beckwith v. Talbot, *supra*; Browne v. Steck, *supra*; New Dunderberg Mining Co. v. Old, *supra*; Craig v. Dewey, *supra;* Hays v. Arbuckle, *supra,* and Royal Indemnity Co. v. United States, (1941) 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361. Other cases apply the test of the going rate for money where interest is awarded as damages. Illustrative of these cases are: Superior Tube Co. v. Delaware Aircraft Co., (1945) D.C.Del., 60 F.Supp. 573; Arkansas Valley Ry. Co. v. United States, (1946) 68 F.Supp. 727, 107 Ct.Cl. 240; United States v. American Metal Co., (1949) D.C.N.J., 86 F.Supp. 533; Speed v. Transamerica Corp., (1955) D.C.Del., 135 F.Supp. 177, and cases cited therein; Hartford National Bank & Trust Co. v. E. F. Drew & Co., (1960) D.C.Ill., 188 F.Supp. 347, and cases cited therein.

I think that Colorado law is here controlling; that Bankers Trust Company v. International Trust Company, *supra*, sets forth the applicable law, and it is to be noted that that case is in accord with Reconstruction Finance Corporation v. Service Pipe Line Co., (1953) 10 Cir., 206 F.2d 814. Acting under an earlier mandate from the Tenth Circuit, the trial judge allowed interest by way of damages at the statutory rate. Judge Murrah said:

" . . . it is fair to state that the question of allowing interest on the claim was neither presented to nor considered by this court in the former appeal. The trial court had no occasion to consider it and our implied inclusion of interest in the mandate was obviously without thought or consideration of its legal justification."

The opinion then refers to several government bulletins fixing the then rate of interest charged by the government at four percent, and the award of statutory interest by the trial judge was modified:

"Having in mind the cost of money to the government at the time material here, and the money market in general, we think that 4% interest is just compensation."

Colorado law permits the award of interest as damages in the interests of fairness; fairness demands the award of interest here; the rate of interest is the statutory rate in the absence of specific proof of the benefit derived by defendant from its breach, but here that proof is present. Defendant obtained a $78-million line of sugar financing at

138 Colo. 442, 334 P.2d 740; City of Denver v. Barber Asphalt Paving Co. (1905) 8 Cir., 141 F. 69, and T. & M. Transport Co. v. S.

W. Shattuck Chemical Co. (1947) 10 Cir., 158 F.2d 909.

11.5%, and by its own wrong, it was able to leave $23-million of the credit line untapped. [Whether defendant could have borrowed more money at the same interest rate is doubtful, but it could not have borrowed more at a lower rate.] The benefit to defendant was the 11.5% interest it saved, and, since benefit to the guilty party is the measure of damage under Bankers Trust Company v. International Trust Company, *supra*, plaintiff and the members of the class are entitled to have added in the judgment 11.5% of the amount not paid them in the initial payment but found to be due them, the interest to run from November 20, 1974.

 The judgment when entered falls under '73 C.R.S. 5–12–102, and it will bear interest at the statutory rate of 6%. The rate of statutory interest, as distinguished from the rate of moratory interest, is fixed and mandatory. Stone v. Currigan, (1959) 138 Colo. 442, 334 P.2d 740; Houser v. Eckhardt, (1974) Colo.App., 532 P.2d 54 [4 Colorado Lawyer 328], [certiorari granted March 10, 1975]; T. & M. Transportation Co. v. S. W. Shattuck Chemical Co., *supra*; North Drive-in Theater Corp. v. Park-in Theaters, (1957) 10 Cir., 248 F.2d 232; Intermountain Rural Electric Ass'n. v. Colorado Central Power Co., (1963) 10 Cir., 322 F.2d 516, and City of Denver v. Barber Asphalt Paving Co., (1905) 8 Cir., 141 F. 69.

 Remaining is plaintiff's request that attorneys' fees be awarded against defendant. In the ordinary case, Colorado law does not permit the award of attorneys' fees in the absence of contract therefor. Schwarz v. Ulmer, (1962) 149 Colo. 601, 370 P.2d 889; Fillmore v. Wells, (1887) 10 Colo. 228, 15 P. 343; Sun Indemnity Co. v. Landy, (1949) 119 Colo. 191, 201 P.2d 602; Leadville Water Co. v. Parkville Water District, (1967) 164 Colo. 362, 436 P.2d 659; Roach Aircraft, Inc. v. Sable, (1973) Colo.App., 513 P.2d 244, and this is the rule in the federal courts. Wilshire Oil Co. of Texas v. Riffe, (1969) 10 Cir.,

409 F.2d 1277; Carter Electric Co. v. Travelers Indemnity Co., (1967) 10 Cir., 382 F.2d 567; Misco Leasing, Inc. v. Keller, (1974) 10 Cir., 490 F.2d 545.

Fleishmann Distilling Corp. v. Maier Brewing Co., (1967) 386 U.S. 714, 87 S. Ct. 1404, 18 L.Ed.2d 475, discusses the history of the "American rule" disallowing attorneys' fees and compares it with the "English rule" which is to the contrary. The case holds that subject to a few limited exceptions, "The rule here has long been that attorneys' fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor." One of the exceptions discussed was the situation in which plaintiffs' attorneys created a fund for the benefit of others, but, as the Court said as to that exception:

> "In that situation to have allowed the others to obtain full benefit from the plaintiff's efforts *without requiring contribution or charging the common fund for attorney's fees* would have been to enrich the others unjustly at the expense of the plaintiff."

This exception, then, does not permit the award of attorneys' fees against the defendant; rather, it allows a charge against the fund. This rule was most recently announced in F. D. Rich Co., Inc. v. United States (1974) 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703. Once more the Supreme Court adhered to the "American Rule," noting as an exception to the rule cases in which the defendant "acted in bad faith, vexatiously, wantonly or for oppressive reasons." Whatever may have been the Sugar Company's motivations in limiting the amount of the initial payment, the Company and its counsel vigorously, skillfully and in good faith defended the action, and I do not think that the *Empson* test of bad faith correlates with the *F. D. Rich* test for allowance of attorneys' fees. This case, as was true in *F. D. Rich Co.* is "plain and simple commercial litigation," and the "American rule" is applicable. Plaintiff relies on Hall v. Cole, (1973) 412 U.S. 1, 93 S.Ct. 1943,

36 L.Ed.2d 702, but the case is inapposite. It was an action brought under Sec. 102 of the Labor-Management Reporting and Disclosure Act [29 U.S.C. § 412] and attorneys' fees were allowed against the union. However, the allowance was made on the theory that the action benefitted a class, and the Court relied on Mills v. Electric Auto-Lite Co., (1970) 396 U.S. 375, 90 S.Ct. 616, 24 L. Ed.2d 593. It was said:

> "Another established exception involves cases in which the plaintiff's successful litigation confers 'a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.' Mills v. Electric Auto-Lite, supra, 396 U.S., at 393–394, 90 S.Ct., at 626. 'Fee shifting' is justified in these cases, not because of any 'bad faith' of the defendant but, rather, because '[t]o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense.' Id., at 392, 90 S.Ct., at 625 . . . . [Thus, as in *Mills*, reimbursement of plaintiff's attorneys' fees out of the corporate treasury simply shifts the costs of litigation to 'the class that has benefitted from them and that would have had to pay them had it brought the suit.' "

The "American rule" here applies, and the fees of plaintiff's counsel cannot be assessed against defendant. If plaintiff wishes to have its attorneys' fees charged against the fund, the matter will be set for an evidentiary hearing as is required by Tenth Circuit law. Irwin v. West End Development Co. (1973) 10 Cir., 481 F.2d 34.

By post-trial motion, plaintiff has moved to amend to ask exemplary damages. That motion to amend is granted, but the request for exemplary damages is denied. The gravamen of plaintiff's claim under either of the theories under which I have allowed recovery is ultimately founded on breach of contract—either outright breach of a specific covenant or a bad faith breach of a contractual duty to use good faith. Although I have imposed liability on defendant for its "fraud, or such gross mistake on (its) part (which implies) bad faith, or a failure to exercise an honest judgment," this is not equivalent to a finding of common law fraud. What I have ultimately found is bad faith or gross mistake on defendant's part in disobeying its contractual obligations, and I have imposed liability on this ground. I have recognized no tort liability as such. That being true, exemplary damages cannot be awarded under the law of Colorado. Page v. Yool (1901) 28 Colo. 464, 65 P. 636; Thuringer v. Bonner (1924) 74 Colo. 209, 222 P. 837; Sams v. Curfman (1943) 111 Colo. 124, 137 P.2d 1017; Aaberg v. H. A. Harman Co. (1961) 144 Colo. 579, 358 P.2d 601; Williams v. Speedster, Inc. (1971) 175 Colo. 73, 485 P.2d 728; Poertner v. Razor (1972) Colo.App. 500 P.2d 989. The distinction between the award of exemplary damages in tort and contract actions is explained in Sager v. Sisters of Mercy (1927) 81 Colo. 498, 256 P. 8. Under settled Colorado law, plaintiff's claim for exemplary damages must be and it is denied.

I have said that the dollar amounts in my findings of fact are subject to contract adjustments. [See, footnotes 3 and 4, *supra*.] By post-trial stipulation, the parties have agreed that with the application of the specified contract adjustments to the fact findings I have made, the anticipated "net return" from the sale of sugar works out to $37.978 per cwt., and that 70% of that figure is $26,585. The per ton payment can be readily ascertained from the $26.585 per cwt. figure,[12] but it is going to take some work by defendant's computer to

---

12. The illustrative table in the contract suggests that the per cwt. amount is about 54.7% of the per ton amount which indicates that the per ton payment would be in the neighborhood of $48.60.

figure the total dollar amount of the judgment to be awarded to the persons who remain in the class. I assume that this computer work can be accomplished and that the parties can agree on the total dollar amount of the judgment to be entered, but, if they cannot, the matter will be set for further hearing. Of course, there shall be added to this computed amount 11.5% interest from November 20, 1974, to date of judgment or to date of payment, whichever is earlier. The reason for the elective dates is that the parties have stipulated that defendant may make and plaintiff and the class members may accept a partial payment of the amount I have found to be due without waiver of any appellate rights. Of course, any such payments will be credited against the judgment. Once the judgment enters, it, or the unpaid portion of it, will bear interest at 6% per annum under the statute ['73 C.R.S. 5–12–102].

Counsel are requested to attempt to agree on a form of judgment, and, if they are unable to agree, they are requested to advise the Court, and the matter will be set for prompt hearing.